(85 Misc. Rep. 105)

### GEORGE et al. v. PIERCE et al.

(Supreme Court, Trial Term, Onondaga County. April, 1914.)

1. INDIANS (§ 27*)—POSSESSION OF LANDS—JURISDICTION OF COURTS.

Under Indian Law (Consol. Laws, c. 26) § 5, providing that jurisdiction not conferred on any peacemakers' court may be exercised by the state courts, the state courts have jurisdiction to determine, as between Onondaga Indians, the right to the possession of lands lying within the boundaries of the Onondaga reservation.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 19, 20; Dec. Dig. § 27.*]

2. INDIANS (§ 3*)—TREATIES—TRANSFER OF PROPERTY—RIGHTS OF STATES.

The authority of the United States to make treaties does not authorize it, under the guise of a treaty with an Indian tribe, to transfer a state's property, and thereby deprive it of those governmental powers which are a part of its inherent rights.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 5–7, 11; Dec. Dig. § 3.*]

3. INDIANS (§ 12*)—TITLE TO RESERVATION—RIGHT OF OCCUPANCY.

The fee of the Onondaga reservation is in the state, and over it the state has the exclusive right of pre-emption, and the Onondagas have the perpetual right of occupancy.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 27, 28; Dec. Dig. § 12.*]

4. INDIANS (§ 3*)—STATUS AND RIGHTS—TREATIES.

The status and rights of the Onondaga Indians depend upon their treaties with the state; they being wards of the state, rather than of the United States, and subject to such supervision on the part of the state as the public policy of the state and the Onondagas demand.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 5–7, 11; Dec. Dig. § 3.*]

5. CONSTITUTIONAL LAW (§ 120*) — IMPAIRMENT OF CONTRACTS — INDIAN TREATIES.

While treaties between the Onondaga Indians and the state could have been denounced by the state at any time before the adoption of the federal Constitution, they are contracts which under the Constitution cannot be impaired.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 279–285, 292; Dec. Dig. § 120.*]

6. INDIANS (§ 32*)—WHAT LAW GOVERNS.

The Onondaga Indians still possess their customary law, and until the Legislature, in those cases where it may, imposes state laws upon them, their customary law prevails.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 4, 52, 53, 57, 58; Dec. Dig. § 32.*]

7. INDIANS (§ 18*)—HEIRSHIP—WILLS.

Heirship, or the disposition of property by will, is unknown among the Onondaga Indians, and children trace their descent from their mother.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 49; Dec. Dig. § 18.*]

8. INDIANS (§ 10*)—DISPOSITION OF PROPERTY OF DECEASED PERSON—RIGHT OF OCCUPANCY.

Where an Onondaga Indian died holding certain lands in the Onondaga reservation under the Indian right of occupancy, and was survived by his widow, a St. Regis Indian, and their six children, and also by

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes

two sisters, who, under the Indian law, were his nearest relatives, and where, pursuant to the Indian Law (Consol. Laws, c. 26), they gave a "dead feast," at which the property of deceased was orally given to the two sisters, the gift being ratified by the chiefs and the donees entering into possession, the right of occupancy was in the sisters, and not in the children, of deceased.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 25, 29, 46; Dec. Dig. § 10.*]

Action by Lydia George and others against Eliza Pierce and others to recover possession of land. Judgment for defendants.

J. David Enright, of Syracuse, for plaintiffs.

Lyman, Canough & Higbee, of Syracuse, for defendants.

ANDREWS, J. The questions to be determined in this case are: First. Have the courts of this state jurisdiction to try disputes between Onondaga Indians as to the possession of lands lying within the boundaries of their reservation? Second. If so, should the courts apply the law of this state or the customary law of the Onondagas? These questions will be examined in their order.

[1] Section 5 of the Indian Law (Consol. Laws, c. 26) provides that:

"Any demand or right of action, jurisdiction of which is not conferred upon a peacemakers' court, may be prosecuted and enforced in any court of the state, the same as if all the parties thereto were citizens."

There is no peacemakers' court on the Onondaga reservation. Consequently, if the Legislature had the power to pass the act in question, there is no doubt but that this court has jurisdiction. Jimeson v. Pierce, 78 App. Div. 9, 79 N. Y. Supp. 3.

The general relation of the Indian tribes to the governments that settled this continent is clearly stated in the great cases of Johnson v. McIntosh, 8 Wheat. 543, 5 L. Ed. 681, Cherokee Nation v. State of Georgia, 5 Pet. 1, 8 L. Ed. 25, and Worcester v. State of Georgia, 6 Pet. 515, 8 L. Ed. 483. Subject to their right of occupancy, the fee of the lands occupied by them and the sole right of pre-emption to the same were in the governments whose citizens had made the discovery. The nations occupying such lands were alien nations. The Indians individually were aliens. Neither as nations nor as individuals did they owe any allegiance to the European governments. As Judge Marshall says:

"The extravagant and absurd idea that the feeble settlements made on the seacoast, or the companies under whom they were made, acquired legitimate power by them to govern the people or occupy the lands from sea to sea, did not enter the mind of any man. They were well understood to convey the title which, according to the common law of European sovereigns respecting America, they might rightfully convey, and no more. This was the exclusive right of purchasing such lands as the natives were willing to sell. The crown could not be understood to grant what the crown did not affect to claim; nor was it so understood. * * * These barbarous nations," referring to the tribes in Pennsylvania, "whose incursions were feared, and to repel whose incursions the power to make war was given, were surely not considered as the subjects of Penn, or occupying his lands during his pleasure. * * * These motives for planting the new colony are incompatible with the lofty ideas of granting the soil and all its inhabitants from sea to sea.

'For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

They demonstrate the truth, that these grants asserted a title against Europeans only, and were considered as blank paper so far as the rights of the natives were concerned."

But to a very limited extent these governments asserted sovereignty over them. They protected them against invasion by other civilized nations, and in return claimed they had so far surrendered their independence as to be incapable of entering into foreign relations. Such nations had never by conquest been reduced to the situation of subjects of any conqueror, and so lost their separate national existence. The right of self-governing had never been taken from them. It had never been questioned, and no attempt made at subjecting them as a people.

In the English colonies this protectorate, this fee, and this right of pre-emption were held in crown colonies to be vested in the crown; in chartered colonies, in the colonial government. At the Revolution they passed to the independent states within whose boundaries the several tribes resided and wherein their lands were situated. Upon the adoption of the Constitution the states surrendered to the general government the sole right to make treaties, and also to regulate commerce with the Indian tribes; also it may be said that the right to protect them against foreign enemies and to prevent their dealing with foreign powers, in short, the limited protectorate over them, passed to the United States, which now alone had the power necessary for such purposes. They became its wards; for it is to be remembered they had never been subjects of the states. They were and always had been separate nations.

The Cherokees may be referred to as an illustration. So far as I can discover, they had always been treated as independent. Once in 1730 Sir Alexander Cuming did demand that they should acknowledge the authority of the king over them and their country, and there seems to have been some submission on their part to such claim. But there was apparently no official action on either side, and the treaty that resulted was simply one of commerce and friendship. And in its act of cession to the United States by Georgia the Cherokees were treated as independent of the state. One provision was:

"That the United States should, at their own expense, extinguish, for the use of Georgia, as early as the same can be peaceably obtained, on reasonable terms, the Indian title to lands within the state of Georgia."

This stipulation "was a distinct recognition of the right in the federal government to make the extinguishment; and also, that, until it should be made, the right of occupancy would remain in the Indians." Worcester v. State of Georgia, 6 Pet. 515, S L. Ed. 483, by Mr. Justice McLean.

Thereafter the states might not deal with the Indians by treaty. They were not subjects. The protectorate over them had passed to the United States. It exclusively could regulate commerce with them. Under such circumstances it might well be held that the tribes within their own boundaries possessed rights with which no state could interfere, that the whole power of regulating intercourse with them was vested in the United States, and that no act of the state Legislature could interfere with their right of self-government.

Such tribes were dependent upon the United States and their rights

were measured by treaties made with the national government. These treaties might be annulled at the pleasure of the superior power. That power might deprive them of self-government or might regulate the use which they should make of it. It might, as it has, refuse to make further treaties with them and subject them to the will of Congress. It might, as it has, provide that crimes committed on Indian reservations by one Indian upon another should be punished by the process of the United States courts. As Judge Miller says in United States v. Kagama, 118 U. S. 375, 6 Sup. Ct. 1109, 30 L. Ed. 228:

"These Indian tribes are the wards of the nation. They are communities dependent on the United States. * * * They owe no allegiance to the states, and receive from them no protection. * * * From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. * * * The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else, because the theater of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes."

The rule, however, that the Supreme Court of the United States has adopted with regard to such Indian nations as the Cherokees does not apply to the Iroquois—the Five (later the Six) Nations. Their historical position is distinct. The alliance of the Creeks or the Cherokees with France and Spain might be troublesome. The course taken by the Iroquois was vital in the struggle for the possession of the continent. Their geographical position, their power, their courage, the constant intrigues of the French, gave them from the earliest times a unique place among the Indian nations. From the beginning the English wished for greater control and influence among them than was thought necessary in ordinary cases. The earliest treaty seems to have been made at Ft. Albany in 1664 between the sachems of the Mohawks and Senecas and Colonel Cartwright on behalf of Colonel Nichols "Governour under his Royall Highnesse, The Duke of Yorke of all his territoryes in America." This was simply a treaty of peace, but in 1684 the sachems of the Cayugas and Onondagas put themselves and their lands under the protection of the king and under no other government than New York. Later in the same year, at a meeting held with Lord Howard of Effingham, governor of Virginia, and Governor Dongan of New York these tribes again stated:

"We have put all our land and ourselves under the Protection of the Great Duke of Yorke * * * and we will neither joyn ourselves nor our land to any other Government than this."

As a consequence of this statement the arms of the Duke of York were immediately affixed to all the Iroquois villages. Later, in 1867, when the duke had become king of Great Britain, a royal warrant was issued to Governor Dongan authorizing him to protect the Five Nations, and declaring that they had acknowledged "our" sovereignty and become "our" subjects. Thereafter in the royal instructions to Sir Edmund Andros in 1688, to Governor Fletcher in 1691, to the Earl of

Bellomont in 1697, and to Governor Hunter in 1709 orders were given to call together the Five Nations "and upon their renewing their submission to our government, you are to assure them in our name that we will protect them as our subjects against the French king." An instance where this command was obeyed is the meeting of the Five Nations called by the Earl of Bellomont in 1699. Their reply to him was an assent to the claim made by the crown:

"You saw wee five nations are the King of England's subjects. Well, brother, be it so"—but if France makes war help us.

Again in the deed of cession made by the Five Nations to Lieutenant Governor Nanfan in July, 1701, an admission was made that the Iroquois were "fellow subjects" with the remaining colonists. The claim that the Iroquois were British subjects was persistently pressed on the French at Quebec and as persistently denied. The dispute seems to have been settled by the treaty of Utrecht in 1713:

"That the subjects of France, inhabiting Canada, shall hereafter give no hindrance or molestation to the five nations or cantons of Indians, subject to the dominion of Great Britain."

From that time on the theory of the colonial government was that the Six Nations were nations subject to the crown—that as nations they owed it allegiance. At times, to spare Indian susceptibilities, the mode of expression was softened, as when Sir William Johnson was instructed to inform them that all, even the governors of New York, were subject to the king; but the theory was maintained. Perhaps the last clear instance of the claim is contained in Governor Tryon's report to the home government in 1774. Speaking of the Indian title he says:

"The second source to the title of this government is grounded on the claim of the Five Nations who are in the treaty of Utrecht acknowledged by France to be subject to Great Britain. Soon after the English conquered this country from the Dutch, pursuing their system of policy, they entered into strict alliance with the natives, who by treaties with this colony subjected themselves to the crown of England and their lands to its protection, and from this period were always treated as subjects and their country considered by this government as part of the province of New York."

It is true that, as has been said by historians, the Indians may have attached no significance to such an act as the affixing of the Duke of York's arms to their villages—no precise meaning to such words as "subjects" and "allegiance." But whether the colonial and British governments should treat them as enemies, as neutrals, as allies, as dependent nations, or as subject nations, was a political, not a judicial, question. The courts must yield to their decision.

In what has been said it is not meant to claim that the individual Indian became a subject of the colonial government; that he ceased to be an alien; that the tribal government was, as a matter of fact, interfered with; that the Indians were, as a matter of fact, subjected to the colonial laws. History shows the truth to be otherwise. Chancellor Kent in Goodell v. Jackson, 20 Johns. 693, 11 Am. Dec. 351, says that one community may be bound to another by ties of different kinds. The submission may leave to the inferior nation a part of the sover-

eignty, restraining it only in certain respects, or it may totally abolish it, or the lesser may be incorporated with the greater power so as to form one single state. The former is the case with the Iroquois. They remain with their own form of government because the colony chose that method of dealing with them. But the colony had somewhat greater authority over them than in the ordinary case of Indian tribes. They were not only dependent, they were subject, nations. The colony could exrcise over them wider powers than, for instance, Georgia over the Cherokeees. They were wards of New York, and New York owned the fee of their lands and had the right of pre-emption thereto—subject to their right of perpetual use and occupation.

At this time the Iroquois occupied lands in the state of New York and elsewhere extending eastwardly to a line running from Wood creek to the Unadilla river. This so-called "line of property" had been fixed at a conference between them and Sir William Johnson at Ft. Stanwix in 1768. Upon the adoption of the Declaration of Independence New York became a nation, and, with other sovereign rights, the protectorate over the Onondagas, the fee of their lands, and this right of pre-emption devolved upon it as the successor of the crown. Seneca Nation v. Christie, 126 N. Y. 122–136, 27 N. E. 275. To it, the national allegiance of those inhabiting the state was due. No other change was made. The Indians did not become citizens. The Onondagas were still treated as a separate nation. Strong v. Waterman, 11 Paige, 607; Ogden v. Lee, 6 Hill, 546; Jackson v. Wood, 7 Johns. 290; Goodel v. Smith, 20 Johns. 693, 11 Am. Dec. 351. By our first Constitution, adopted at Kingston in 1777, the authority of the state over the Indians and its right of pre-emption were recognized.

On February 6, 1778, the state acceded to the Articles of Confederation. Laws 1778, c. 1. Under them each state retained its sovereignty, freedom, and independence, and every power and right not expressly delegated to the United States. But they did give to the Congress the sole and exclusive right of "entering into treaties and alliances" and of "regulating the trade and managing all affairs with the Indians not members of any of the states; provided that the legislative right of any state within its own limits, be not infringed or violated." In pursuance to this authority in October, 1784, at Ft. Stanwix the United States made a treaty of peace with the Six Nations and received them into its protection. By this treaty their western boundary was established and they were secured in the peaceful possession of the lands they inhabited to the east of the same. This treaty was renewed and confirmed in January, 1789.

There is no doubt that under the Articles of Confederation Congress had the power, at least with New York's approval, to enter into such a treaty. Whether the Six Nations were still so far an independent people that a treaty might be made with them was a matter for its discretion. Historically there was sufficient justification for such an act. They were scattered in New York, in Canada, in Pennsylvania. They claimed by conquest far wider territories. They had been making open war against the United States, and they were sufficiently powerful to make their hostility a matter of moment. Peace with them

should be made as a whole, by the United States as a whole. But it does not follow that under the guise of a treaty of peace with the Six Nations Congress might regulate the status of the Onondagas occupying territory wholly within the boundaries of New York. The care taken to preserve the independence of the several states is an answer to such a claim.

Further, in 1782 a committee of Congress had reported that all the lands belonging to the Six Nations of Indians have been in due form put under the crown as appendant to the government of New York, so far as respects jurisdiction only; that that colony has borne the burden of protecting and supporting the Six Nations of Indians and their tributaries for 100 years, as the dependents and allies of that government; that the crown of England has always considered and treated the country of the Six Nations as one appendant to the government of New York; that they have been so recognized and admitted by their public acts of Massachusetts, Connecticut, Pennsylvania, Maryland, and Virginia. A still more conclusive answer, however, comes from the practical construction of its rights adopted by the state. As early as October 23, 1779, an act was passed by the New York Legislature reciting that the Six Nations had by repeated treaties and grants "put themselves and the country which they occupied under the protection of the government of this state, while it was administered by the Crown of Great Britain," appointing commissioners to treat with the Mohawks, Onondagas, Cayugas, and Senecas, and providing that, in any treaty of pacification made with them by the United States, New York should be admitted thereto as a principal and contracting party "by particular specification as an independent state." Laws 1779, c. 29. Other acts appointing commissioners to treat with the Indians were passed in 1783, 1784, and 1788. Therefore, while these treaties gave peace to the Six Nations and secured them in the possession of their lands, it cannot be held to have transferred from the state of New York to the general government any rights possessed by the former over the Indians.

In September, 1788, the state made a treaty with the Onondagas at Ft. Stanwix. By this treaty the Indians ceded to the people of the state, forever, all their lands. In the second article, however, it was provided that of said ceded lands the Onondagas should hold a certain portion "to themselves and their posterity forever, for their own use and cultivation, but not to be sold, leased, or in any manner aliened or disposed of." The state was empowered to prevent others than Onondagas from settling on lands held by them, and the Indians agreed to aid in the apprehension of felons who came upon them. The present reservation is a portion of such lands. It seems to me reasonably clear, therefore, that up to this time the Onondagas remained, as they had been before, a nation dependent upon and owing allegiance to the state of New York, occupying lands over which the state had the right of pre-emption. Congress might recognize their nationality and might treat with them in regard to public matters. But it was not understood that the state had surrendered authority over them, or was prohibited from making agreements with them as to the purchase of their land.

The Constitution of the United States went into effect in March,

1789. This gave the President the right to make treaties with the advice and consent of the Senate and forbade a state to enter into any treaty. It also conferred on Congress the power to regulate commerce with the Indian tribes. Nevertheless in November, 1793, the state entered into a second treaty with the Onondagas, whereby the latter ceded a part of their reservation and gave to the state the right to open highways through the lands reserved to them.

In January, 1795, the United States again made a treaty with the Six Nations whereby it acknowledged the land reserved to the Oneida, Onondaga, and Cayuga Nations in their treaties with the state of New York to be their property, and the same "shall remain theirs until they choose to sell the same to the people of the United States who have the right to purchase." The United States government thus recognized the right of the state to make treaties with the Onondagas as to their lands, not only under the Articles of Confederation, but under the Constitution—recognized that such agreements are not such treaties as states are prohibited from making. How far the treaty interfered with the pre-emptive rights of the state is another question. It is true that this treaty was "constitutionally made in the exercise of the treaty-making power of the federal government, and became under the Constitution the supreme law." Seneca Nation v. Christie, 126 N. Y. 122–139, 27 N. E. 275. It is also true that all judges are bound thereby.

[2] But if this treaty was an attempt to transfer from the people of the state to the people of the United States the fee and the right of pre-emption of the Onondaga lands it would be in so far ineffective. A reasonable construction must be given to the Constitution, having regard to the circumstances under which it was formed and its purposes. The authority of the United States as to treaties is not unlimited. It may not, under the guise of a treaty, deprive a state of those governmental powers which are a part of its inherent rights. It may not transfer its property. Geofroy v. Riggs, 133 U. S. 258, 10 Sup. Ct. 295, 33 L. Ed. 642; Prevost v. Greenaux, 19 How. 1, 15 L. Ed. 572; Seneca Nation v. Christie, 126 N. Y. 122–143, 27 N. E. 275. Probably, however, such a result was never intended. Certainly no such effect has ever been given to this treaty. For in July, 1795, in February, 1817, and in February, 1822, three treaties were made between the state and the Onondagas, whereby the latter ceded to the people portions of their reservation, until there were left to them the 7,300 acres they now occupy.

It may be that the language used in the treaty, general as it is, was understood in a limited sense. By the treaty of peace with Great Britain, New York lost all control of those Iroquois who had settled north of the boundary line. By chapter 38 of the Laws of 1780 the state authorized the cession to the Confederation of its rights both of jurisdiction and pre-emption over all lands west of its present boundaries. Its claim to these lands was based, as Governor Tryon reports, on Iroquois conquests; and as to these lands, by the cession referred to, the United States did possess the right to purchase. As to them the treaty stated the facts.

Nor has the pre-emptive right of the state or its authority over the Iroquois living in New York been affected by the authority conferred by the Constitution upon the government of the United States to regulate commerce with the Indian tribes. In the first permanent statute passed by our national government in 1802 for this purpose, it was provided that:

"Nothing in this act shall be construed to prevent any trade or intercourse with Indians living on lands surrounded by settlements of the citizens of the United States, and being within the ordinary jurisdiction of any of the independent states." 2 Story's Laws, p. 844, § 19.

The state treaties referred to, treaties with other Iroquois nations, acts of the Legislature, all show that this act and later acts amending it were not held to apply to the Onondagas and their relations to the state of New York.

[3, 4] I think, therefore, that the status of the Onondagas and the title to the reservations occupied by them are clear. The fee of the reservation is in the state. Over it the state has the exclusive right of pre-emption. The Onondagas have the perpetual right of occupancy. They constitute an alien nation—but a subject one. They are wards of the state—not of the United States—subject to such supervision and authority on the part of the state as the public policy of the state and the Onondagas demand.

[5] The status of the Onondagas is precisely what it was before the Articles of Confederation and the adoption of the Constitution, with two exceptions. Then as now their status and rights depended upon their agreements and treaties with the state. But the state might at any time denounce these treaties. Whether it should do so or not is a political, not a judicial, question. If it takes that course, there is no redress in the courts. Ryan v. Knorr, 19 Hun, 540.

But these treaties are contracts, and under the Constitution no state may pass any law impairing the obligations of contracts. In addition, under their treaties with the United States, validly made, and which must be enforced by the courts, the Onondagas obtained certain rights which may not be infringed by the state. In determining what these rights are we must assume that the treaties of 1784 and 1789, in so far as Congress was authorized to make the same, have the same force and effect as those entered into after the Constitution became operative. Ware v. Hylton, 3 Dall. 199, 1 L. Ed. 568.

The United States recognizes the existence of the Six Nations, and of the Onondagas as one of them. The treaty of 1784 is made with the Senecas, Mohawks, Cayugas, and Onondagas. So is the treaty of 1789. That of 1795 is with the Six Nations. The United States gives them peace. The peace is declared to be perpetual. The Six Nations will forever allow to the people of the United States the free use of certain harbors. Four thousand five hundred dollars are to be expended yearly for the benefit of the Six Nations. The Six Nations are secured in the possession of their lands.

The state of New York, therefore, may not deprive the Onondagas of their lands without their consent. Further, recognized by the United States by its treaties with them as a nation, the status of the

Onondagas is fixed. It cannot be altered by any action of the state.
The latter may not dissolve the nation, and annex it, or sweep away
its form of government. The Kansas Indians, 6 Wall. 737, 18 L. Ed.
667.

"But the rights of the Indians do not depend on this or any other statutes
of the state, but upon treaties, which are the supreme law of the land. It is to
these treaties we must look to ascertain the nature of these rights, and the
extent of them. It has already been shown that the United States have ac-
knowledged the reservations to be the property of the Seneca Nation, that they
will never claim them nor disturb this nation in their free use and enjoyment,
and that they shall remain theirs until they choose to sell them. These are
the guarantees given by the United States, and which her faith is pledged to
uphold." The New York Indians, 5 Wall. 761, 18 L. Ed. 708.

The Constitution "confers on Congress the powers of war and peace; of
making treaties, and of regulating commerce with foreign nations, and among
the several states, and with the Indian tribes. These powers comprehend all
that is required for the regulation of our intercourse with the Indians. They
are not limited by any restrictions on their free actions. * * * The Con-
stitution, by declaring treaties already made, as well as those to be made, to
be the supreme law of the land, has adopted and sanctioned the previous trea-
ties with the Indian nations, and consequently admits their rank among those
powers who are capable of making treaties." Worcester v. State of Georgia,
6 Pet. 515, 8 L. Ed. 483.

But except in so far as they are guarded by treaties—except so far
as its power is limited by the commerce clause of the Constitution—
the state retains all its rights and authority over the Onondagas. The
nation holds no such relation to New York as did, for instance, the
Cherokees to Georgia. Its position is something less than that of an
independent nation. It is dependent on the state, as it has always been,
and as a dependent and subject nation is subject to certain powers of
supervision and control.

Precisely the powers that shall be exercised by the superior over the
dependent nation and its people is a political, and not a judicial, ques-
tion. Ordinarily the former attempts to control the latter so far as
may be fairly necessary to promote the security and the prosperity of
both peoples. That so far, at least, the Legislature of New York may
control the Onondagas, the practical construction of a century proves.
Over 30 treaties have been made by the state with the Six Nations
without the supervision or control of the general government. Our
courts have assumed criminal jurisdiction over them. Our Legislature
has asserted their right so to do. And this jurisdiction has been men-
tioned by the Supreme Court of the United States without disapproval.

Act after act has been passed regulating the affairs of the Onondagas.
For instance, none but Indians may reside on their lands. An agent is
appointed with certain supervisory powers. 2 R. L. 1813, c. 92, §§
11, 44. Indian lands are to be set off as a school district and the same
are regulated. Laws 1841, c. 234, § 10. Our laws as to husband and
wife are applied to the Indians, and their marriage is regulated, and
permission is given to distribute tribal land in severalty. Laws 1849,
c. 420, §§ 3, 4, 7. None but an Indian may remove timber from the
reservation, nor shall any Indian cut timber for sale. Laws 1873, c.
96. The superintendent of public instruction shall establish schools
and erect buildings therefor on the reservation. Laws 1856, c. 71. It

is made lawful for an Indian to practice medicine on the reservation on certain conditions. Laws 1884, c. 445. An insane Indian may be apprehended on the reservation and removed to an asylum. Laws 1888, c. 451. Many similar statutes have been passed with regard to the Senecas and the Cayugas.

I am clear, therefore, that when the Legislature provides that "any demand or right of action, jurisdiction of which is not conferred on a peacemakers' court, may be prosecuted and enforced in any court of the state, the same as if all the parties thereto were citizens" (Indian Law, § 5), there is no excess of authority. Jimeson v. Pierce, 78 App. Div. 9, 79 N. Y. Supp. 3. There is, as has been said, no peacemakers' court on the Onondaga reservation. There is no court of any kind. Disputes in some cases seem to have been settled by the chiefs, but they had no authority to enforce their decisions. Under the circumstances the state had the power to confer jurisdiction on its courts. It was an effort to confer upon its wards peace and justice.

A reference should be made to the opinion of Judge Talcott in Ryan v. Knorr, 19 Hun, 540. He states that the Indian tribes are not foreign nations. Their relations to the United States resemble those of a ward to his guardian. They are independent political communities, retaining the right of self-government, subject to the protecting power of the United States, and a state Legislature has no jurisdiction over the Indian territory contained within the territorial limits of such state. Judge Talcott's statement, however, is so weakened by later cases in the same department upholding the power of the Legislature to control Indian affairs, and is so opposed to the course of legislation, that it can no longer be held a controlling authority.

[6] As to the second question, in spite of cases which may seem, but which do not, I think, in reality take a contrary position, I have little doubt. At least in matters which affect the morality, the security, the stability of the nation, the Legislature may impose its will on the Onondagas. Where their customary law conflicts with these purposes, or with inherent justice and equity, the Legislature may substitute for it the law of the state. It has done so with regard to marriage and divorce. Indian Law, § 3. It may do so with regard to inheritance and with regard to the relationship of children to their father. Goodell v. Jackson, 20 Johns. 693, 11 Am. Dec. 351. But the Onondagas still possess their own customary law. And until the Legislature sees fit, in those cases where it may, to impose our laws upon them, their customary law prevails, and it is the duty of the courts to enforce it.

[7] The Legislature has never interfered with the Onondaga customs relating to the disposition of the real and personal property of a deceased Indian. Dole v. Irish, 2 Barb. 639.

Among the Onondagas no such thing as heirship or the disposition of property by will is known. Nor do children trace their descent from the father, but from the mother. The children of an Onondaga father and a St. Regis mother are St. Regis, and not Onondaga, Indians.

[8] Ten days after the death of an Onondaga his eldest female relative gives what is called a "dead feast." The spirit of the deceased is supposed to be present. To it are invited his relatives and friends.

After the banquet his property is given away orally by an Indian present who is familiar with the ritual used and who is accustomed to preside at such occasions.  His public announcements seem to be controlled, largely at least, by the giver of the feast.  The action of the dead feast is ratified by the chiefs, and title to the property of the deceased so passes to the donee.  As has been seen, the Onondagas have a perpetual right of occupancy of their reservation.  According to their customary law any individual Indian who clears and cultivates any portion of the reservation acquires the perpetual right of occupancy of that portion.  He may sell or give it away.  It passes on his death by the ceremony of the dead feast.

One David Billings, an Onondaga Indian, died on May 12, 1905.  He had married a St. Regis Indian, and his widow and six children survived him.  At his death he held certain land on the reservation under the Indian right of occupancy.  David Billings also left him surviving two sisters, who, under the Indian law, were his nearest relatives.  One or both of them gave the dead feast, and the land in question was given to them.  The widow and children might remain in possession, however, until the sisters paid or tendered them $125.  Such tender was made, the sisters took possession, and this action was begun.  Under these circumstances, in view of what has been said, I must hold that this court has jurisdiction to entertain the action, but that, by virtue of what occurred at the dead feast, the right of occupancy of the property in question is not in the children but in the sisters of the deceased.

The three cases upon which the plaintiff seems to rely are Peters v. Tallchief, 121 App. Div. 309, 106 N. Y. Supp. 64, Matter of Printup, 121 App. Div. 322, 106 N. Y. Supp. 74, and Hatch v. Luckman, 155 App. Div. 765, 118 N. Y. Supp. 689, 140 N. Y. Supp. 1123.  In Peters v. Tallchief proceedings were begun by the plaintiff to obtain possession of certain land on the Tuscarora reservation, upon which land the defendant had squatted without any right whatever.  The proof showed that the property was being held by the plaintiff in accordance with the customs and practices recognized by the Indians themselves, and the question was whether she might resort to our courts to vindicate such a right.  It was held that she might do so.  This case, therefore, only affirms the proposition that the Legislature may confer upon our courts jurisdiction over disputes between Indians.

In Matter of Printup the deceased was an Indian also residing upon the Tuscarora reservation.  An application was made to the Surrogate's Court of Niagara county for the appointment of an administrator.  It was held that under section 5 of the Indian Law the court might take jurisdiction.  There was no proof in the case of any custom among the Tuscarora Indians with regard to a dead feast or any other Indian custom for the distribution of property otherwise than under the laws of our state.

In Hatch v. Luckman the decision of the court below is affirmed upon the very able opinion of Mr. Justice Wheeler.  The question was as to the distribution of the property of a deceased Indian.  There was proof of the dead feast custom, and it was claimed that the laws of the

state of New York did not control in the distribution of the estate of deceased Indians. The surrogate of Niagara county had appointed administrators of the estate of the deceased, and his right to do so was also questioned. It was held that the Surrogate's Court had jurisdiction, that the state courts had jurisdiction, and that the laws of the state prevailed over the Indian custom. But it will be observed that the Tonawandas are not a separate and distinct nation. They were a fragment of the Senecas, living, not upon their ancient land, but upon land purchased by them from the Holland Land Company.

"It thus appears that the old Indian title and right of possession of the Indians was extinguished, and the Tonawanda Indians held title by virtue of the deeds and conveyances above set forth. The political sovereignty of the state of New York attached to every foot of the land embraced within the boundaries of the Tonawanda reservation."

The dead feast could not be considered an Indian probate court, for—

"such a court has no sanction for its existence in the Constitution or in any legislation of this state. It has never been recognized in law as having any legal existence."

Further than that, the custom of the dead feast, in so far as it was possible, was formally abolished by a resolution of the council of the tribe passed about the year 1888. The dead feast—

"we hold has been abolished by the action of the Indian council of the tribe, if it ever had any existence, and had no right to exercise powers of division and distribution over such estates."

On the Tonawanda reservation there had been allotments of land sanctioned by the Indian Law and the transfer of the land in question was made in pursuance to the provisions of that law. Under such circumstances, the decision of Judge Wheeler does not seem to be in point where the question relates to land on the Onondaga reservation.

Judgment is therefore ordered for the defendants, with costs.

Judgment for defendants, with costs.