## SUPREME COURT — SPECIAL TERM — ONONDAGA COUNTY.

### July 17, 1924.

## THE PEOPLE EX REL. ROSANNA SCHUYLER v. CHARLES H. LIVINGSTONE, SUPT., ETC.

### (123 Misc. 605.)

(1) INDIANS—STATUS PROVED BY GENERAL REPUTATION OR RESIDENCE ON RESERVATION—RELATOR DEEMED INDIAN, DESCENDANT OF ONEIDA TRIBE, RESIDING ON RESERVATION OF ONONDAGA TRIBE.

Under the rule that the status of an Indian may be proved by general reputation or his residence upon a reservation, a person, born upon the Mohawk Indian reservation, whose mother is a half-breed Oneida Indian, and who has lived upon the Onondaga Indian reservation for upwards of thirty-three years with various Indians and for the last four years with her husband, a full blooded Oneida Indian, will be deemed an Indian, a descendant of the Oneida tribe, one of the Six Nations, but not a member of the Onondaga tribe though residing on its reservation.

(2) SAME—HABEAS CORPUS—PROCEEDING TO INQUIRE INTO DETENTION OF RELATOR CONVICTED FOR ASSAULT UPON WHITE PERSON ON HIGHWAY PASSING THROUGH ONONDAGA RESERVATION.

A crime committed on a state highway constructed under the treaty of 1793 between the state of New York and the Onondaga Indians and thereafter maintained as a highway for public use pursuant to section 12 of the Indian Law and passing through the Onondaga reservation, will be deemed to have been committed within the territorial limits of the reservation.

(3) SAME—JUSTICE OF PEACE OF ONONDAGA HAS JURISDICTION BY REASON OF THE SOVEREIGN POWERS OF THE STATE.

A habeas corpus proceeding to inquire into the cause of the detention of the relator, convicted for assault committed upon a white person along a highway passing through the Onondaga Indian reservation and imprisoned in the Onondaga penitentiary, will be dismissed notwithstanding the fact that the relator is an Indian, a descendant of the Oneida tribe, one of the Six Nations, residing on the Onondaga reservation but not a member of the Onondaga tribe, since the justice of the peace of the town of Onondaga had jurisdiction by reason of the sovereign power of the state; the rule that the federal courts have exclusive jurisdiction for the prosecution of crimes does not apply to Indians of the Six Nations.

WRIT of habeas corpus to inquire into the cause of the detention of a prisoner.

*Dixson, Searle & Jeffrey,* for the relator.

*Frank J. Malpass,* district attorney (*Oscar J. Brown,* of counsel), for the respondent.

CHENEY, J.:

This is a writ of habeas corpus to inquire into the cause of the detention of Rosanna Schuyler, a prisoner in the Onondaga Penitentiary. Various informalities appear in the papers. The petition is not properly sworn to, as it was verified before one of the attorneys of record of the relator. Kuh v. Barnett, 57 N. Y. Super. Ct. 234. The same irregularity appears in the traverse to the return. These irregularities are not jurisdictional, but may be waived. Vreeland v. Pennsylvania Tanning Co., 130 App. Div. 405. The writ originally ran to the sheriff of Onondaga county, while the prisoner was in the custody of the superintendent of the penitentiary. Both these officers have made returns to the writ and the proceeding has been treated as if the writ ran to the proper person. These

31

informalities will, therefore, be disregarded, and the proceeding determined on the real questions involved.

The relator was convicted before a justice of the peace of the town of Onondaga, Onondaga county, N. Y., of the crime of assault in the third degree, committed upon one Rundel Jones, a white boy, upon the highway which passes through the Onondaga Indian Reservation in Onondaga county, and sentenced to imprisonment in the Onondaga County Penitentiary for ten days and to pay a fine of twenty-five dollars and be imprisoned until said fine is paid, not exceeding twenty-five days. She was in custody under the commitment issued by the justice at the time these proceedings were instituted.

She alleges that such imprisonment is unlawful for the reason that she is an Indian, and the crime for which she was convicted was committed within the confines of an Indian reservation, and, therefore, that the courts of this state have not jurisdiction to punish her therefor.

The return and traverse thereto raise two questions of fact. The first is as to the status of the relator as an Indian, and the second, whether the crime was committed upon an Indian reservation. These questions must be determined before we reach the question of the jurisdiction of our courts. Evidence was taken at the hearing upon those questions of fact.

The evidence upon the question of the nationality of the relator is not very satisfactory, as it depends for the most part upon the testimony of the relator herself, which is necessarily largely hearsay, but is probably competent under the pedigree rule. She claims that she was born upon the Mohawk Indian Reservation in Canada, that her father was a Mohawk Indian and her mother a half breed Oneida Indian, born of an Oneida Indian mother by a white father. The respondent claims that relator was brought to the reservation in Canada when an infant by her mother who subsequently married the Indian she claims as her father. No proof of that fact was produced,

the only evidence being that as a child relator was living on the reservation in Canada with her mother and supposed father and was brought up by them there.    It also appears that the relator has lived upon the Onondaga reservation, off and on, for about thirty-three years, with various Indians, and for the last four years has lived there with her husband, a full blooded Oneida Indian.    That is probably sufficient to make out a prima facie case under the rule that the status of an Indian may be proved by general reputation or his residence upon a reservation.    Charbonneau v. DeLorimier, 8 Que. Pr. 115.

An interesting question is raised on account of the mixed blood of the relator, whether the rule of the common law that the child follows the condition of the father (United States v. Ward, 42 Fed. Rep. 320; Smith v. Bonifer, 154 id. 883) applies, or the exception to that rule that the child of a white citizen and of an Indian mother, who is abandoned by his father, is nurtured and reared by the Indian mother in the tribal relation, becomes a member of the tribe of the mother (Farrell v. United States, 110 Fed. Rep. 942; United States v. Higgins, 103 id. 348; United States v. Hadley, 99 id. 437); or as is held in other authorities that under the Indian Law and customs, the offspring of mixed Indian and white marriages take the race and nationality of the mother.    United States v. Saunders, 27 Fed. Cas. No. 16,220, p. 950; Alberty v. United States, 162 U. S. 499; Waldron v. United States, 143 Fed. Rep. 413.    It is unnecessary, however, to decide which is the proper rule, as by the application of either, the result would be that the relator is an Indian.    If the rule of the common law applies, as her father was an Indian, she would be an Indian irrespective of the status of her mother.    If the other rule applies it will be necessary to go back to the first admixture of white blood in order to determine the status of the mother.    She was the child of an Indian mother and a white father.    If the status of the mother governs, that off-

spring was an Indian, and she would confer the same status upon her child, the relator. I, therefore, hold that for the purpose of the proceeding, the relator is an Indian, a descendant of the Oneida tribe, one of the Six Nations, but not a member of the Onondaga tribe although residing on its reservation.

Upon the question as to whether the crime was committed within the reservation, it is conceded that the locus of the crime was within the territorial limits thereof, but the claim is made that by reason of the fact that it was committed upon the highway, it cannot be said to be within the reservation. I am not convinced of the soundness of that contention.

By the treaty between the state of New York and the Onondaga Indians, made in 1788, the Onondagas ceded all their lands to the state of New York, with the proviso that " The Onondagas shall of the said ceded lands hold to themselves and their posterity forever, for their own use and cultivation, but not to be sold, leased or in any manner aliened or disposed of to others " a tract of land described by metes and bounds, which includes the location of this crime. Subsequently by the treaty of 1793, certain of those lands were released to the state of New York. This treaty contained this further provision: " The People of the State of New York shall from time to time and at all times forever hereafter have full power and authority to lay out and open roads through any part of the lands appropriated by the People of the State of New York to the use of the Onondagas and not hereby quit claimed in the same way and manner as roads now are and hereafter may be directed by Law to be laid out and made generally in other parts of the state." Presumptively, this highway in question was laid out pursuant to that authority, and is being maintained pursuant to the provisions of section 12 of the Indian Law, and presumptively the public generally have the right to use the highways laid out upon the reservation for the purpose of passage, without becoming trespassers upon the reservation. The court

will take judicial notice that such has been the practical construction of the treaty by the acts of the parties since the treaty.

Subsequently by the treaties of 1795, 1817 and 1822, other lands of the reservation were released to the state of New York, leaving the reservation as it now exists, with the highway thereon, upon which this crime was committed. I cannot see how the construction and maintenance of this highway, pursuant to the treaty, or the right of the public to use this highway for the purpose of passage, conceding that it exists, makes it any less a part of the reservation than any other lands therein, and I so hold. Peters v. Malin, 111 Fed. Rep. 244.

The main question to be here determined is whether the courts of this state have jurisdiction to administer the criminal law of this state against a sojourning Indian, not a member of the tribe, residing upon the Onondaga reservation, for a crime against the person of a white person committed within the limits of that reservation, which crime is not within the enumeration of major crimes contained in the 9th section of the federal Act of 1885 (23 U. S. Stat. at Large, 385; now U. S. Crim. Code [35 U. S. Stat. at Large, 1151], § 328) as to which the United States courts are given exclusive jurisdiction by that Act. This question is a most important one. As was said in State v. Doxtater, 47 Wis. 278: "In order to deprive the state of its power to exercise one of the most important attributes of sovereignty—the punishment of crime, the protection of the lives, persons and property of those within its borders and the preservation of peace and good order in every part of the state—the party alleging the want of such power must show most clear and incontrovertible reasons why such power should not be assumed and exercised."

That the United States courts have exclusive jurisdiction for the prosecution of the crimes mentioned in that statute

when committed by Indians while residing in reservations other than those of the so-called Six Nations of Iroquois Indians outside of New York state is now conclusively established by the case of United States v. Kagama, 118 U. S. 375, and other cases following it, and that exclusive jurisdiction has been extended to prosecutions for those enumerated crimes committed by Indians residing upon the reservations of the Six Nations in New York state by the case of People ex rel. Cusick v. Daly, 212 N. Y. 183, a case which discusses the principles affecting the conflict of authority arising from " our dual form of government in which there are two distinct sovereignties, federal and state, each is supreme within its appropriate sphere."

The ground of the decision is that as the federal government has assumed jurisdiction over these particular crimes " our state courts must give way before the higher authority which this statute vests in the Federal Courts," the court saying: " Even if we assume that, in the absence of federal legislation, the state has the most ample power to legislate for the Indians within its borders, there seems to be no escape from the conclusion that when congress does act the power of the state must yield to the paramount authority of the federal government."

There are also cases which construe the Kagama Case, supra, as holding that the control of the United States over the matter of crimes committed on Indian reservations is exclusive, and as in the legislation by congress, certain acts only are enumerated as crimes it is evidence that in the judgment of congress, only such acts should be made crimes when committed by Indians in view of their imperfect civilization, and that it is without the power of the state to supplement this by making other acts crimes, even although such act would be criminal if committed by another than an Indian.    State v. Campbell, 53 Minn. 354; Matter of Blackbird, 109 Fed. Rep.

139; Matter of Lincoln, 129 id. 247; Peters v. Malin, supra. All of these cases arose in territory outside of the original thirteen states, where no doubt can exist but that the sovereignty of the government of the United States was supreme and its right to deal with the Indians exclusive.

Whether the doctrine of those cases should be extended to offenses committed by Indians upon the reservations of the Six Nations in New York state is one of extreme doubt.   As was pointed out in the case of George v. Pierce, 85 Misc. Rep. 105, in an able and historically valuable opinion written by Mr. Justice Andrews, now a judge of the Court of Appeals, the rule that the Supreme Court of the United States has adopted with reference to Indian tribes generally, did not apply to the Six Nations.   At an early day the colony of New York asserted its sovereignty over the Six Nations and assumed a protectorate over them, and " upon the adoption of the Declaration of Independence, New York became a nation, and, with other sovereign rights, the protectorate over the Onondagas (one of the Six Nations), the fee of their lands, and this right of pre-emption devolved upon it as the successor of the crown. * * * It seems to me reasonably clear, therefore, that up to this time the Onondagas remained, as they had been before, a nation dependent upon and owing allegiance to the state of New York, occupying lands over which the state had the right of pre-emption.   Congress might recognize their nationality and might treat with them in regard to public matters.   But it was not understood that the state had surrendered authority over them, or was prohibited from making agreements with them as to the purchase of their land " (p. 117), and that by its entry into the United States by acceding to the articles of confederation and the approval of the Constitution those rights were not surrendered by the state.

The George Case further holds that " the status of the Onondagas and the title to the reservations occupied by them

are clear. The fee of the reservation is in the state. Over it the state has the exclusive right of pre-emption. The Onondagas have the perpetual right of occupancy. They constitute an alien nation—but a subject one. They are wards of the state—not of the United States—subject to such supervision and authority on the part of the state as the public policy of the state and the Onondagas demand " (p. 120). " But except in so far as they are guarded by treaties—except so far as its power is limited by the commerce clause of the constitution, the state retains all its right and authority over the Onondagas. * * * It is dependent upon the state as it always has been, and as a dependent and subject nation is subject to certain powers of supervision and control. Precisely the powers that shall be exercised by the superior over the dependent nation and its people is a political and not a judicial question. Ordinarily the former attempts to control the latter so far as may be fairly necessary to promote the security and the prosperity of both peoples." (P. 122.)

This case further calls attention to the fact that in the exercise of the power of sovereignty, this state has made over thirty treaties with the different tribes of the Six Nations; its legislature has asserted the right to criminal jurisdiction over them (Laws of 1822, chap. 204; 2 R. S. part 4, chap. 1, tit. 7, § 1; Penal Law, § 39), and the courts of this state have enforced those criminal laws, and many acts have been passed by the legislature regulating the affairs of the Indians, particularly the Onondagas.

The George Case involved the question of the jurisdiction of our courts to enforce the civil rights of the Onondaga Indians among themselves pursuant to a statute (Indian Law, § 5) passed for that purpose, and the decision was that the state had power to confer that jurisdiction upon its courts; that it was an effort to confer upon its wards peace and justice—an exercise of sovereignty.

So far as I have been able to discover, the rule of the George Case has not been overruled by our courts. It was referred to in People ex rel. Cusick v. Daly, 212 N. Y. 183, 192, but the reasoning of the case was not disapproved, although the exclusive jurisdiction of the courts of the United States over the crimes mentioned in the statute of 1885 was conceded.

The question which we are considering has apparently been left open by the Court of Appeals. In Mulkins v. Snow, 232 N. Y. 47, 51, the court says "When the state of New York legislates in relation to their (the Indians) affairs, its action is subject to the paramount authority of the federal government. The contention has been made with some force that when Congress does not act, no law runs on an Indian reservation save the Indian tribal law and custom. * * * The principle that state laws may not apply to tribal reservation Indians in the absence of affirmative legislation on the part of Congress need not, however, be adopted."

The Supreme Court of the United States has recognized this right of sovereignty in the state of New York over the persons and property of the Indians of the Six Nations in the case of State of New York v. Dibble, 21 How. (U. S.) 366, a case involving the power of the state to pass an act relating to intrusions upon Indian lands, in which the court said: "Notwithstanding the peculiar relation which these Indians hold to the Government of the United States, the State of New York had the power of a sovereign over their persons and property, so far as was necessary to preserve the peace of the commonwealth, and protect these feeble and helpless bands from imposition and intrusion. The power of a state to make such regulations to preserve the peace of the community is absolute, and has never been surrendered."

There is no doubt but that, notwithstanding the statute of 1885, jurisdiction exists in the courts of the state in which the reservation is contained to punish other than Indians for

·offenses committed on a reservation but not against the person ·or property of an Indian, and that jurisdiction is exclusive of the Federal courts (Draper v. United States, 164 U. S. 240; United States v. McBratney, 104 id. 621), and also to punish an Indian for an offense committed off the reservation. People v. Becker, 215 N. Y. 42. It has also been held that one who is not a tribal Indian is just as amenable to the criminal laws of the state for an offense committed on the reservation as if the offense had been committed anywhere else in the state. State v. Campbell, supra.

The relator was not a member of the Onondaga tribe, but a mere sojourner upon their reservation. The offense which she committed was not against an Indian, but against a white person, a citizen of the state of New York. I, therefore, hold that the court had jurisdiction in the case and that the relator was properly imprisoned by virtue of the conviction. An order may be entered dismissing the writ and remanding the relator to the custody of the superintendent of the Onondaga Penitentiary.

Ordered accordingly.