UNITED STATES v. GARDNER.

(District Court, E. D. Wisconsin. May 9, 1911.)

1. INDIANS (§ 1*)—MIXED BLOODS—FEDERAL LAW—"INDIAN."

Where defendant was a mixed blood Indian, who for many years had been enrolled as a member of the Stockbridge and Munsee Tribe in Wisconsin, had been recognized as such by the tribe and by the government, and as such was enrolled and became an allottee of land, and for many years lived within the limits of the reservation under the care of an Indian agent and policed by Indian police, he was an Indian, within Fed-

eral Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1151 [U. S. Comp. St Supp. 1909, p. 1487]) § 328, conferring jurisdiction on the federal courts of certain crimes committed by one Indian against another within the limits of an Indian reservation, though his father was a white man and his mother a part blood Indian who had never been enrolled.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 1; Dec. Dig. § 1.*

For other definitions, see Words and Phrases, vol. 4, pp. 3544–3545; vol. 8, p. 7686.]

**2.** INDIANS (§ 31*)—FEDERAL CONTROL—RESIDENCE WITHIN INDIAN RESERVATION.

Though an Indian has become a full fledged citizen of the United States, and resides on land patented to a prior grantor in fee simple absolute, yet so long as he remains within the limits of an Indian reservation he is subject to the constitutional control of the federal government.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 23; Dec. Dig. § 31.*]

**3.** INDIANS (§ 12*)—INDIAN LANDS—RESERVATION.

Act Cong. Feb. 6, 1871, c. 38, 16 Stat. 404, provided for a severance of the two parties into which the Stockbridge and Munsee Indians had divided, for the sale of the land on which they were located, and for payment in cash to the so-called citizen party, and for a reservation for the other party. It was also directed that a roll of the members of the tribe should be prepared and a survey made and a subsequent allotment, to be returned to the Secretary of the Interior within one year; that the title to the reservation and of the lands described therein should be held by the United States in trust for the individual Indians and their heirs, and the surplus lands embraced in the reservation remaining after making such allotment be held by the United States in like manner subject to allotment to individuals of the tribe who may not have received any of the reservation, or to be disposed of for the common benefit of the tribe. *Held*, that the Indians having continued to occupy the remnant of the land as a reservation under the charge of an Indian agent, such remaining portion must be regarded as having been properly set aside as a reservation.

[Ed. Note.—For other cases, see Indians, Cent. Dig. §§ 27, 28; Dec. Dig. § 12.*]

**4.** INDIANS (§ 38*)—INDIAN LANDS—ALLOTMENT—STATUTES—EFFECT—INDIAN CRIMES—JURISDICTION.

Act Cong. June 21, 1906, c. 3504, 34 Stat. 382, provided for the allotment of all the land remaining in the Stockbridge and Munsee Reservation in Wisconsin to the several Indians of that tribe in fee simple without condition. Such allotments were approved by the Secretary of the Interior on January 1, 1910, and patents were delivered April 4th following. *Held* that, prior to the approval of the allotments and the delivery of patents to the allottees for the balance of such reservation, it continued subject to the jurisdiction of the federal courts with reference to crimes committed by one Indian against another thereon; the statute not constituting a grant in præsenti, but only authority to break up the reservation by allotments and patents to be made in futuro.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 22; Dec. Dig. § 38.*]

Nelson Gardner, who for many years had lived within the limits of the Stockbridge and Munsee Reservation, enrolled as an Indian of that tribe, was indicted for rape committed within the limits of the reservation December 18, 1909, on the person of an Indian girl. He was indicted under Federal Penal Code (Act March 4, 1909, c. 321, 35 Stat. 1151 [U. S. Comp. St. Supp. 1909, p. 1487]) § 328, conferring jurisdiction on the federal courts to punish certain specified crimes, in-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

cluding rape, when committed by one Indian against another within the limits of an Indian reservation. On defendant's plea to the jurisdiction of the court. Overruled.

The facts in the case are for the most part admitted by the government as set forth in the abstract and brief submitted by defendant's counsel. Defendant sets out among other things that the penalty imposed by the federal statute for this crime is much more severe than that imposed by the state law.

Guy D. Goff and E. J. Henning, for the Government.
P. J. Winter, for defendant.

QUARLES, District Judge (after stating the facts as above). [1] The first contention of the defendant is that he is not an Indian within the meaning of the statute; that his father was a white man, and that his mother was a part blood Indian who was never enrolled in the tribe. There is no virtue in this contention. The defendant is a mixed blood Indian who for many years has been enrolled as a member of the Stockbridge and Munsee tribe in Wisconsin, and recognized as such by the tribe and by the government. As such Indian, so enrolled, he became an allottee. For many years he had lived within the limits of the reservation which was under the care of an Indian agent and policed by the Indian police. The situation as to blood and enrollment was almost identical in State v. Campbell, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169, and it was held that Belonge was an Indian within the meaning of the "crimes act," so called. Under these circumstances, the defendant cannot be heard to say that he is not an Indian within the meaning of the statute.

[2] Second. It is strenuously contended by the defendant that the piece of land upon which he resided, and where the crime is alleged to have been committed, was the subject of allotment and patent in fee simple absolute, to one Eli Williams from whom the defendant has acquired the title by certain mesne conveyances; that therefore he was entitled to be considered a citizen and became amenable to the state laws; that he paid taxes to the state authorities upon this piece of land for several years, and that he has voted at special and general elections in the town of Herman, county of Shawano, where his home is located; that therefore the government of the United States has no longer jurisdiction over him, because he became a full-fledged citizen of the state of Wisconsin.

This contention is completely met by the Supreme Court in United States v. Celestine, 215 U. S. 278, 30 Sup. Ct. 93, 54 L. Ed. 195, and United States v. Sutton, 215 U. S. 291, 30 Sup. Ct. 116, 54 L. Ed. 157, where it is held in substance that although it were conceded that the defendant was a full-fledged citizen of the United States, still he remained under the constitutional control of the federal government because, being an Indian, he lived within the limits of an Indian reservation.

I have not overlooked the fact that the Celestine Case differs from the case at bar in two important particulars. In that case only a part of the reservation had been allotted, and there remained a considerable

area which still constituted a reservation to all intents and purposes; and, second, the patents there awarded were trust patents, so called, excluding the power of alienation for 25 years. Yet the reasoning of the case is believed to reach the case at bar. Along the same line it is contended that the defendant became entitled to full citizenship pursuant to the act of 1887 (Act Feb. 8, 1887, c. 119, § 6, 24 Stat. 390), because he abandoned the habits and customs of the Indian and lived separate and apart from the tribe. It is matter of common knowledge that the Stockbridge and Munsee Indians have long since abandoned the blanket and the tepee, and have adopted the garments of the white man and abandoned the nomadic life. There is nothing to show that Gardner differed in this regard from any other member of the tribe. But we have seen that under the doctrine of the Supreme Court it would be immaterial whether the defendant was entitled to citizenship upon this ground, because he continued to live within the limits of the reservation.

[3] It is contended that there really never was any reservation formally set apart for this tribe of Indians; that after the government had sold most of the lands belonging to the tribe, there remained about 18 sections which was never formally set apart as a reservation. An examination of the statutes will show the error into which defendant has fallen. The act of 1871 (Act Feb. 6, 1871, c. 38, 16 Stat. 404) provided for a severance of the two parties into which the Stockbridge and Munsee Indians had divided. The sale of the land and payment in cash to the so-called citizen party was provided for, and provision made for a reservation for the other party. And it was directed that a roll should be prepared showing who are the members of such tribe and a survey made and a subsequent allotment, such allotment to be returned to the Secretary of the Interior within one year; that the title to such reservation and of the lands described therein shall be held by the United States in trust for the individual Indians and their heirs, the surplus lands embraced in such reservation, remaining after making such allotments, shall be held in like manner by the United States, subject to be allotted to individuals of said tribe who may not have received any portion of said reservation, or to be disposed of for the common benefit of said tribe. Pursuant to this enactment the Indians continued to occupy this remnant of land as a reservation, under the charge of an Indian agent. No further discussion of this proposition is therefore necessary.

[4] The next contention of the defense is more difficult as well as more important. It is strenuously insisted that, if the 18 sections not allotted were justly held to be a reservation, the same was abolished by virtue of the legislation of Congress to which reference will hereafter be made. The act of June 21, 1906 (Act June 21, 1906, c. 3504, 34 Stat. 382), provided for allotment of all the lands remaining in the Stockbridge and Munsee reservation to the several Indians of that tribe in fee simple without condition. Such allotments have now been made. They were approved by the Secretary of the Interior on the 1st of January, 1910, and patents were delivered on the 4th of April, 1910. The question is, What was the status of

this · supposed reservation at the time of the alleged commission of the crime, December, 1909?

It is well settled that the government is not bound to continue its guardianship over the Indian indefinitely. It may renounce the same at any time. It may be conceded that when Congress had authorized the allotment in severalty and in fee simple of all the lands belonging to the tribe, and after the approval of such allotment and the actual delivery of the patents therefor, there remained no reservation, but that each allottee in fee simple had become thereby a citizen of the United States, and a citizen of the state in which he resides and amenable to the laws of said state.

In Farrell v. United States, 110 Fed. 942, 49 C. C. A. 183, the Circuit Court of Appeals of the Eighth Circuit, speaking through Judge Sanborn, lays down the rule that in ascertaining the tribal and other relations of Indians, courts generally follow the executive and legislative departments to which the determination of these relations has been specially entrusted.

It is contended by the government that the Department of the Interior through its Indian Office, has always maintained, and does now maintain, that the Stockbridge and Munsees were a tribe, and that the lands occupied by the tribe constituted a reservation within the meaning of the law, up to the time that the last remnant of land was distributed and conveyed. The precise question here presented, however, is what effect these several enactments of Congress had prior to the approval of the allotment by the government of the tribal lands.

In nearly every case involving the survival of federal jurisdiction after allotment that has been carried to the Supreme Court, there have been complications by way of treaties or agreements with the tribes to whom the lands have been allotted, or laws of the state within which the allotted land is situated, whereby federal jurisdiction over the allotted land and Indians survive the allotment. Such was the case in Dick v. United States, 208 U. S. 340, 28 Sup. Ct. 399, 52 L. Ed. 520; United States v. 43 Gallons of Whisky, 93 U. S. 188, 197, 23 L. Ed. 846; United States v. Celestine, supra; United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532; Couture v. United States, 207 U. S. 581, 28 Sup. Ct. 259, 52 L. Ed. 350. This case was disposed of by per curiam opinion in the appellate court, and no opinion appears to have been written by the District Judge; but from an examination of the brief of the Attorney General it appears that two provisions of the old treaty of 1854 were brought over and incorporated into the patents in that case, whereby there was awarded to the government plenary police power over the sale and introduction of spirituous liquor as long as the President should think wise and proper after the allotment in severalty.

In Bates v. Clark, 95 U. S. 204, 208 (24 L. Ed. 471), the court say:

"Indian lands ceased without any further act of Congress to be Indian country after the Indian title had been extinguished, unless by the treaty by which the Indians parted with their title, or by some act of Congress, a different rule was made applicable to the case."

The instant case is peculiar in this: There is no treaty and no agreement with this tribe extending the jurisdiction of the federal government beyond the allotment in severalty. When the state of Wisconsin was organized there was no reservation by the government, in the enabling act or otherwise, of federal jurisdiction over the Indian reservations. On the other hand, the state had by its highest court, always claimed jurisdiction over persons and things everywhere within its territorial limits. State v. Doxtater, 47 Wis. 278, 2 N. W. 439; State v. Morrin, 136 Wis. 552, 117 N. W. 1006.

Here we have presented, then, the naked question whether the reservation survived the act of June 21, 1906, and upon that question hinges the jurisdiction of the federal court in this case. This jurisdiction simply rested either in the state or the federal government alone. It is quite impossible that both jurisdictions should attach at the same time over the same territory. Re Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. Ed. 848. From necessity there can be no divided authority. Kansas Indians, 5 Wall. 737, 18 L. Ed. 667.

It is argued with some force that the title to land may pass by virtue of a treaty or an act of Congress, when such is clearly the intention of the government. Francis v. Francis, 203 U. S. 233, 27 Sup. Ct. 129, 51 L. Ed. 165, is cited in support of this proposition. In that case a grant was made by treaty to a particular reservee, by name, of 640 acres of land near a certain river located in the state of Michigan. Following a local rule of construction theretofore laid down by the Supreme Court of Michigan, which has become a rule of property in Michigan, the grant was held effectual to pass the fee to the reservee, and it remained only to define the limits and boundaries of the grant, which was accomplished by the patent. An examination of the act of June 21, 1906, will show that it was not within the contemplation of Congress by that act to vest any particular tract of land in any particular Indian. It was plainly nothing more than a general direction to proceed in the usual way to first determine who were entitled to grants, and then to issue patents therefor which would pass the title. This purpose is disclosed in the language of the act.

"All Indians who have not heretofore received patents for lands in their own right shall be given *allotments of land* and patents in fee simple."

This language clearly excludes the idea of a grant in præsenti. The body of Indians entitled to allotments in severalty is constantly changing. In no other way can the names of allottees entitled to specific pieces of land be ascertained. An allotment is practically a condition precedent to any grant under this act. In the meantime the status quo remains unchanged. The general rule upon the subject is defined by Congress in the act of May 8, 1906 (Act May 8, 1906, c. 2348, 34 Stat. 182):

"*When the land shall have been conveyed to the Indian by patent in fee* as provided by section 5 of this act, then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside."

In Now-ge-zhuch, 69 Kan. 410, 76 Pac. 877, it is laid down that the change of status takes place "upon the completion of the allotments and conferring patents to each of the allottees."

The distinction that we have undertaken to draw between the treaty provisions in the Francis Case, supra, and the general enactment of June 21, 1906, is sustained in the following cases: Blackfeather v. United States, 190 U. S. 368, 379, 23 Sup. Ct. 772, 47 L. Ed. 1099; Fleming v. McCurtain, 215 U. S. 56, 30 Sup. Ct. 16, 54 L. Ed. 88; Sac and Fox Indians of the Mississippi, in Iowa, v. Same in Oklahoma (No. 614, October term, 1910), 220 U. S. 481, 31 Sup. Ct. 473, 55 L. Ed. 552.

Up to the time this crime is alleged to have been committed, the reservation remained as a physical and legal fact, notwithstanding the promise of Congress to grant patents in fee simple. There was no change of occupancy. The defendant still lived within the limits of the reservation under the charge of an Indian agent, and to a certain extent the tribal relations were continued. So that the relation between the defendant and the government would not seem to have been changed until the allotments had been approved, or perhaps until the patents had been actually issued. It is not necessary in this case to determine at which of these dates the reservation expired. It is true that Congress had given positive assurance that these remaining 18 sections of land should be held to belong to the Indians who were occupying them and that fee-simple patents would be forthcoming. But up to the time this crime is alleged to have been committed, nothing had been done to work any legal change in the title of the land or to impair the jurisdiction of the government. The defendant was still an Indian living within the reservation and therefore amenable to the jurisdiction of the United States for the crime charged.

For these reasons the plea must be overruled.