### Ex parte PERO et al.

### LEE, Warden, v. PERO et al.

### No. 6471.

Circuit Court of Appeals, Seventh Circuit.
Sept. 26, 1938.

was committed was a licensed trader on what is known as the Bad River Indian Reservation, the alleged crime having been committed within the confines of that reservation. The reservation had been set aside under the terms of a treaty with the Federal Government as a reservation for the Lake Superior Chippewa Indians and particularly "for the La Pointe band, and such other Indians as may see fit to settle with them." [1]

It is the contention of the petitioners, appellees, that jurisdiction to try petitioners for the commission of the alleged crime was exclusively with the proper federal court; that the trial in the state court and the judgment rendered therein were a nullity and, consequently, that the petitioners were being held in prison unlawfully by the respondent-appellant, Warden of the Wisconsin State Prison. The foregoing propositions rest upon the assumption that petitioners are Indian wards of the United States Government and that by force of the laws of the United States the alleged crime was cognizable only in a district court of the United States, and that the petitioners are subject to the exclusive jurisdiction of the United States.

Congress has enacted that "All Indians committing against the person or property of another Indian or other person any of the following crimes, namely, murder * * * on and within any Indian reservation under the jurisdiction of the United States Government, * * * shall be subject to the same laws, tried in the same courts, and in the same manner, and be subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States." [2]

The trial judge considered the jurisdictional investigation to be limited to the narrow question of what jurisdictional test was to be made under the foregoing act; and in his memorandum opinion aptly states the question thus: "Who is an Indian within the meaning of that Act?"

The respondent, appellant here, urges that neither of the petitioners is an Indian within the meaning of Section 548, supra, and that both, therefore, were subject to the criminal laws of the state of Wisconsin, even though the crime was committed by them on an Indian reservation. As to petitioner Pero the respondent urges

Orland S. Loomis, Atty Gen., and Joseph E. Messerschmidt, Asst. Atty. Gen., for appellant.

W. J. Kershaw, of Milwaukee, Wis., and Thomas L. St. Germain, of Lac Du Flambeau, Wis., for appellees.

Before SPARKS, MAJOR, and TREANOR, Circuit Judges.

TREANOR, Circuit Judge.

This is an appeal from a judgment of the District Court granting a writ of habeas corpus. The petitioners were convicted in a state court of Wisconsin of the crime of murder and were sentenced to life imprisonment in the Wisconsin State Prison. The person against whom the alleged crime

[1] Treaty of Sept. 30, 1854, 10 Stat.  [2] 18 U.S.C.A. § 548.

that by force of congressional enactment[3] Pero had been made subject to the criminal laws of Wisconsin and was no longer under federal guardianship. Pero was a full-blood Chippewa Indian and respondent assumes that prior to the commission of the alleged crime Pero had been allotted lands under a "trust patent."[4] This is a written instrument or certificate, issued to an allottee, which declares that the United States will hold the allotted land for a designated period, usually 25 years, in trust for the sole use and benefit of the allottee, or, in case of his death, for the use of his heirs; and the certificate further declares that at the expiration of the trust period the United States will convey the land to the allottee, or to his heirs, in fee, discharged of the trust and free of all charge or incumbrance. And it is the position of respondent that the issuance of a certificate of competency not only freed Pero of restrictions on his power to alienate the allotted land, but also freed him from the guardianship of the United States.

As to petitioner Moore, respondent contends that he was not an "Indian" for the purposes of federal jurisdiction because he had not been enrolled with any Indian tribe or on any reservation. Although Moore was not enrolled, he resided on the reservation and maintained tribal relations with the Indians thereon. His mother was a full-blooded Indian of the St. Croix Band of Lake Superior Chippewas. Moore's father was a half-blood whose mother was a full-blood Indian. Moore's father and mother and their relatives resided on the reservation and were known to the other Indians as Chippewa Indians. Members of bands other than the La Pointe Band of Lake Superior Chippewas resided on the reservation, and the reservation was by treaty set aside for the La Pointe Band and other Indians who might see fit to settle with them. The District Court found Moore to be an Indian and to be a member of the "Lost Tribe of Lake Superior Chippewas."

The petitioners were convicted in 1927; and at that time the law, as announced by the Wisconsin Supreme Court, was that the state courts had jurisdiction of crimes committed by Indians on a reservation.[5]

Thereafter in 1931 in the case of State of Wisconsin v. Rufus,[6] the Wisconsin Supreme Court overruled its prior decision and held that such crimes were exclusively within the federal jurisdiction. The effect of this holding is that by the law of Wisconsin the state court was without power to try the petitioners for the alleged offense if they were Indians within the meaning of Section 548, supra.

The federal statute which gives federal courts exclusive jurisdiction over the crime in question when committed by an Indian on an Indian reservation does not define "Indian" for the purposes of the act. And we have not been cited to any section of a federal act, and we have been unable to find any, which purports to give a definition of the term "Indian" for purposes of jurisdiction in criminal causes.

In the case of United States v. Rogers[7] it was held that a white man who at a mature age had been adopted into an Indian tribe does not thereby become an Indian within the meaning of an exception in the statute which provides that a named section "shall not extend to crimes committed by one Indian against the person or property of another Indian." The court was of the opinion that the exception was confined to those who by the usages and customs of the Indians are regarded as belonging to their race. In United States v. Higgins,[8] it was held that one born of a white father and an Indian mother, and who was a recognized member of the tribe of Indians in which his mother belonged, was not subject to taxation under the laws of the state in which he resided. In the course of its opinion the court referred to various treaties and statutes in which "the executive and political departments of the government have recognized persons having at least one-half Indian blood in their veins, whose fathers were white men, which half-bloods lived and resided with the tribes to which their mothers belonged, as Indians." And it was further stated in the opinion: "It is well known to those who have lived upon the frontier in America that, as a rule, half-breeds or mixed-blood Indians have resided with the tribes to which their mothers belonged; that they have, as a rule, never found a welcome

---

[3] 25 U.S.C.A. §§ 349 and 372.

[4] 25 U.S.C.A. § 348.

[5] State v. Doxtater, 47 Wis. 278, 2 N. W. 439.

[6] 205 Wis. 317, 237 N.W. 67.

[7] 4 How. 567, 572, 45 U.S. 567, 11 L. Ed. 1105.

[8] C.C., 103 F. 348, 352.

home with their white relatives, but with their Indian kindred. It is but just, then, that they should be classed as Indians, and have all of the rights of the Indian."

In Vezina v. United States [9] the daughter of a half to three-fourths Chippewa woman and a white man was held to be by blood a member of the Fond du Lac Band of the Chippewas of Lake Superior, the court thereby overruling the action of the Department of Indian Affairs in refusing enrollment and allotment to the daughter. And in Sully, et al. v. United States,[10] where one-eighth bloods were involved the court stated that the persons were of sufficient Indian blood to substantially handicap them in the struggle for existence, and held that they were Indians and were entitled to be enrolled as such.[11]

In Doe ex dem. Lafontaine v. Avalina,[12] it was necessary for the court to construe a statute which forbade devises of land by Indians to persons other than Indians, except by consent of the state. The particular question was whether a three-eighths blood "Indian" was an Indian within the meaning of the statute. The person involved had been treated as an Indian by both whites and Indians, and spoke the language of the Indians; and her habits and mode of living were those of the Indians about her. The court discussed the tests of "preponderance of blood" and of "the habits of the person"; and suggested that the purpose of the act was to protect Indians from the fraud of their neighbors and that the act should be construed for their benefit. The court held that the person was an Indian for the purposes of the statute. The Indiana court adopted what may be said to be the test of a substantial amount of Indian blood plus an actual racial status as an Indian. In the instant case petitioner Moore was an Indian under the three tests: (1) preponderance

of blood, (2) habits of the person, and (3) substantial amount of Indian blood plus a racial status in fact as an Indian.

Many congressional acts relating to Indians have recognized both full-bloods and mixed-bloods as Indians for purposes of the acts. Of special significance for the present question is the treaty relating to the Chippewas of Lake Superior [13] (of which Moore is a member if he is an Indian), in which the mixed-bloods were expressly mentioned, and it was recognized therein that a mixed-blood could be a member of the Chippewas. The treaty contains the following, art. 2, subd. 7: "Each * * * person over twenty-one years of age at the present time of the mixed bloods, belonging to the Chippewas of Lake Superior * * *." [14]

■ We are convinced that the overwhelming weight of authority, both judicial and statutory, requires the conclusion that a child of an Indian mother and half-blood father, where both parents are recognized as Indians and maintain tribal relations, who himself lives on the reservation and maintains tribal relations and is recognized as an Indian, is to be considered an Indian within the protection of the federal guardian-ward relationship and within the meaning of "Indian" as used in the jurisdictional statute in question. The lack of enrollment in the case of Moore is not determinative of status. Only Indians are entitled to be enrolled for the purpose of receiving allotment and the fact of enrollment would be evidence that the enrollee is an Indian. But the refusal of the Department of Interior to enroll a certain Indian as a member of a certain tribe is not necessarily an administrative determination that the person is not an Indian. Moore's mother failed to be enrolled as a St. Croix Indian because she was too young,—not because she was not an In-

[9] 8 Cir., 245 F. 411.

[10] 8 Cir., 195 F. 113.

[11] See State v. Phelps, 93 Mont. 277, 19 P.2d 319, 320, for an excellent review of the decisions of Federal Courts on the question of whether a child of an Indian mother and white father follows the condition of the mother or father.

[12] 8 Ind. 6.

[13] 10 Stat. 1109, 1110.

[14] Other examples:

(1) 25 U.S.C.A. § 355 applicable only to full-bloods.

(2) 25 U.S.C.A. § 479 recognizes a half blood as an Indian.

25 U.S.C.A. § 163, an enrollment statute, recognizes that less than full blood may be a member of the Indian tribe; 35 Stat. 313 to the same effect.

(3) 25 U.S.C.A. § 184 provides that children of the marriage of an Indian mother and white man where said Indian woman was recognized by the tribe, shall have the same rights to the property of the tribe as any other member of the tribe.

(4) 28 U.S.C.A. § 41(24), Jurisdictional Act.

dian. She failed to be placed upon the Bad River Reservation rolls because at the time the roll was made her mother was away. And when Moore's mother sought to have him enrolled on the Bad River Reservation rolls the enrolling officer refused to enroll him because "her children belonged to the St. Croix Lost Band." Obviously a refusal of the enrolling agent to enroll Moore on the ground that he belonged to the "St. Croix Lost Band" cannot be taken as evidence that Moore is not an Indian. On the contrary it is evidence that he is an Indian.

In view of the foregoing we conclude that petitioner Moore is an Indian within the meaning of Section 548, supra. And it follows both under the law of Wisconsin as announced by the Supreme Court of that state in State of Wisconsin v. Rufus, supra, as well as under the law of the United States, that the Circuit Court of Ashland County, Wisconsin, was without jurisdiction to hear and pronounce judgment in the cause of State of Wisconsin vs. Paul Moore, and that petitioner is being unlawfully detained in the Wisconsin State Prison.

Pero is admittedly a full-blood Indian, but respondent urges that he ceased to be subject to the laws of the United States when he received a certificate of competency from the Department of the Interior in 1920. The correctness of this proposition depends upon the construction of certain Federal statutes.

The congressional act, under which respondent assumes that Pero became an allottee and which declares the procedure, by force of which an allottee could become emancipated from the guardianship of the United States and become subject to the laws of Wisconsin, was enacted in 1887 and commonly known as the General Allotment Act.[15] This act, as amended in 1906,[16] authorizes the Secretary of the Interior to allot lands to Indians on reservations by issuing to the allottee a "trust patent," by the terms of which the United States agrees to hold the designated tract of land in trust for the allottee during a trust period of twenty-five years.[17] The "trust patent" obligates the United States to convey the allotted land to the allottee by patent in fee simple at the expiration of the trust period; and the act declares that "at the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, * * * then each and every allottee * * * shall be subject to the laws, both civil and criminal, of the State or Territory in which they may reside."

The act further provides for United States citizenship for Indians to whom allotments are made under the act and who receive patents in fee simple "under the provisions of this Act." The act contains a proviso which authorizes the Secretary of the Interior, in his discretion, to issue a patent in fee simple to any allottee whenever the Secretary is satisfied that the allottee "is competent and capable of managing his or her affairs"; and it is further provided that "thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent."

In addition to the foregoing the act contains the following specific jurisdictional proviso: "That until the issuance of fee-simple patents all allottees to whom trust patents shall be issued shall be subject to the exclusive jurisdiction of the United States."

Pero was a reservation Indian and if he was allotted land under a trust patent in accordance with the terms of the General Allotment Act, as assumed by respondent, it is clear that he is still under the exclusive jurisdiction of the United States by force of that Act, unless at the expiration of the trust period the allotted land was conveyed to him by a fee simple patent. The record discloses that the trust period had expired prior to the date of the commission of the alleged crime; but it is unquestioned that the Secretary of the Interior has not at any time conveyed the allotted land to Pero by a patent in fee simple.

As stated above the only procedure by which Pero, as an allottee under the General Allotment Act, could have been freed from the "exclusive jurisdiction of the United States" was by a conveyance by the United States of the allotted land by a patent in fee simple at the expiration of the trust period. But the respondent urges that the failure to convey as required by

---

[15] 24 Stat. 388; 25 U.S.C.A. § 331 et seq.

[16] 34 Stat. 182, 25 U.S.C.A. § 349.

[17] The President is authorized to extend the trust period. 25 U.S.C.A. § 348.

the General Allotment Statute is cured by the fact that a certificate of competency was issued to Pero under a later statute.[18] To evaluate the merit of this contention it is necessary to consider the scope and purpose of this later act and its relation to pertinent sections of the earlier statute under which respondent assumes that Pero received his allotment.[19]

Section 372 of 25 U.S.C.A. is included in "An act to provide for determining the heirs of deceased Indians, for the disposition and sale of allotments of deceased Indians, for the leasing of allotments, and for other purposes." The section authorizes the Secretary of the Interior, in his discretion, to issue a certificate of competency, upon application therefor, to any Indian "to whom a patent in fee containing restrictions on alienation has been or may hereafter be issued"; and the issuance of "such certificate" is declared to have the effect "of removing the restrictions on alienation contained in such patent." Upon the receipt of a certificate of competency an owner under "a patent in fee containing restrictions on alienation" became in legal effect an owner in fee simple. But the application of the act is restricted to Indians who hold land under a fee simple patent with restrictions on alienation, and the sole declared purpose and legal effect of the issuance of the certificate of competency is to remove the restrictions on alienation contained in such patent. No language of the act purports to affect the personal status of the patentee in his relation to his tribe, or to the United States. And there is no intention to free the patentees from the jurisdiction of the United States. The act does not purport to amend the earlier General Allotment Act and there is no inconsistency between them. But assuming that the issuance of a certificate of competency under Sec. 372 to the holder of a restricted fee simple patent makes him, in law, an owner under a patent in fee simple, then such owner may become a citizen of the United States un-

der Act May 8, 1906, 34 Stat. 182, 25 U.S. C.A. § 349, since the latter section declares that "every Indian born within the territorial limits of the United States to whom allotments shall have been made and who has received a patent in fee simple under the provisions of this Act, or under any law or treaty" shall be "a citizen of the United States" and be entitled "to all the rights, privileges, and immunities of such citizens."

It is important to note, however, that Section 349 distinguishes between the legal consequences of the receipt of a patent in fee simple by a trust allottee under the act of 1887 and the receipt by an allottee of a patent in fee simple "under any law or treaty." In the former case the allottee acquires United States citizenship and is made "subject to the laws, both civil and criminal, of the State" in which he may reside; but in the latter case the only consequence is that the patentee becomes a citizen of the United States.[20] Furthermore, the issuance of a certificate of competency under Section 372 has no legal consequence except in connection with a previously issued patent in fee simple with restrictions on alienation, and the language of the statute limits the legal consequences to the removal of "the restrictions on alienation contained in such patent." But in the instant case, assuming that Pero is an allottee under a trust patent and not a holder of a patent in fee simple, the Secretary of the Interior had no authority under Section 372 to issue him a certificate of competency for the purpose of removing restrictions on alienation. The only source of authority of the Secretary of the Interior to deal with Pero as a trust-patent allottee was conferred by the act of 1887 as amended, and no provision of this act authorizes the Secretary of the Interior to substitute a certificate of competency for the authorized patent in fee simple. In fact there is no authorization to issue a certificate of competency to a trust patentee for any purpose. And in the absence

---

[18] 36 Stat. 855, 856; 25 U.S.C.A. § 372.

[19] The pertinent sections of the earlier statute are sections 348 and 349 of 25 U.S.C.A. and the pertinent section of the later statute is Sec. 372 of the same title.

[20] In United States v. Celestine, 215 U. S. 278, 30 S.Ct. 93, 54 L.Ed. 195, the Supreme Court held that one who had received a patent in fee simple under treaty

authority and in consequences thereof, had become a citizen of the United States by force of Section 349 did not cease to be subject to the exclusive jurisdiction of the United States. The court stated that "although made a citizen of the United States and of the state, it does not follow that the United States lost jurisdiction over him for offenses committed within the limits of the reservation." [Page 96.]

of express statutory authorization the only possible ground for a judicial holding that the issuance of a certificate of competency under Section 372 dispenses with the necessity of the issuance of a patent in fee simple under Section 349 would be that the difference is in form only and that the congressional policy and intent under the act of 1887 is given effect by the issuance of the certificate of competency under the act of 1910.

■ The scope and expressed purpose of the Act of 1910 is narrow and definitely stated. The Secretary of the Interior is authorized to issue a certificate of competency to any Indian ("or in case of his death to his heirs") to whom a patent in fee containing restrictions on alienation has been, or may be issued. "And such certificate shall have the effect of removing the restrictions on alienation contained in such patent." Since the effect of removing the restrictions on a restricted patent in fee is to put the holder in the condition of one who has received a patent in fee simple "under any law or treaty" it would follow that if Pero had been the holder of a patent in fee with restrictions the issuance of the certificate of competency would have entitled him to United States citizenship under Section 349. But even in that case, under the holding in United States v. Celestine, supra, he would not have been freed from the exclusive jurisdiction of the United States. That is a legal consequence which can be attached only by express declaration of Congress, and Congress did not so provide in either the act of 1887 or 1910. But Pero, if in fact a trust patent allottee under the General Allotment Act, could not be affected by any legal consequences attached by the Act of 1910 to the issuance of a certificate of competency to the holder of a patent in fee with restrictions on alienation; and, consequently, no provision of the act of 1887, as amended, can become effective as to Pero merely by reason of action by the Secretary of the Interior performed in accordance with, and by the authority of, the provisions of the act of 1910.

The certificate of competency which was issued in 1920 purports to be "by virtue of the power and authority vested" in the first assistant to the Secretary of the Interior by Section 1 of the Act of Congress of June 25, 1910, 25 U.S.C.A. § 372; and the certificate purports to invest Pero "with full power and authority to sell and convey any and all lands above described." Also the certificate recites that Pero had been found to be fully competent and capable of transacting his own business and caring for his own individual affairs. Section 349 of title 25 of the United States Code, 25 U.S.C.A. § 349, does not authorize the issuance of a certificate of competency to a trust allottee and, consequently, does not attach any legal consequences to such action. It does, however, require the Secretary of the Interior to be satisfied that any Indian allottee is competent and capable of managing his or her affairs before the Secretary is authorized to issue to the allottee a patent in fee simple. Assuming that the issuance of the certificate of competency under Section 372 can be accepted as conclusive evidence of the exercise of discretion required of the Secretary of the Interior by Section 349, it was still necessary for the Secretary to issue a patent in fee simple in order to free Pero from the exclusive jurisdiction of the United States. Since Congress expressly provided that the Secretary of the Interior should first be satisfied that a trust allottee was competent and capable of managing his own affairs as a condition precedent to the issuance of patent in fee simple, it would seem to be doing violence to legislative intent for this court to substitute a certificate of competency for both the determination of competency and the final and essential act of issuing the patent in fee simple. And special force is added to the foregoing since the issuance of a patent in fee simple by the Secretary is not mandatory upon his being satisfied that a trust allottee is competent and capable of managing his own affairs.

■ But even if we should consider the issuance of the fee simple patent to be a mere formality, we are met with the obvious intent of Congress to treat this formality as a necessary condition precedent to the release of a trust allottee from the exclusive jurisdiction of the United States. We cannot disregard designated formality in construing and applying acts of Congress when it is clearly the intent of Congress that legal consequences be attached to the form rather than to the substance. It is not an uncommon legislative device to attach legal consequences to a formality on the assumption that the performance of the required formality is the best assurance that proper consideration has been given to matters of substance.

But, as a matter of substance, we are confronted with the further difficulty that an exercise of the discretion contemplated in Section 372 does not involve the same considerations as the exercise of discretion by the Secretary of the Interior under Section 349. We must assume that when the Assistant Secretary of the Interior, in the exercise of his discretion, issued the certificate of competency he considered only the legal consequences which are attached by the provisions of Section 372 under which he issued the certificate. And as pointed out above the only legal consequence contemplated was the removal of restrictions on alienation. The Secretary was not required to consider the serious consequences of emancipation of Pero from the jurisdiction of the United States either as they affected Pero or as they would give effect to the policy of the United States. The foregoing necessarily would not have been present to the mind of the Secretary of the Interior if he had been intending to exercise his discretion to issue a certificate of competency to an Indian, to whom a patent in fee containing restrictions on alienation had been issued. But under Section 349 it is obvious that the Secretary of the Interior in exercising his discretion to issue a patent in fee simple to a trust allottee ought to be satisfied not only that the allottee is competent and capable of managing his or her affairs, but also that it would be to the best interest of the allottee for the allottee to become emancipated from the exclusive jurisdiction of the United States and become subject to the laws of the state in which he resides.

But apart from the foregoing we are bound by the clearly expressed intent of Congress that "until the issuance of fee-simple patents all allottees to whom trust patents shall be issued shall be subject to the exclusive jurisdiction of the United States." We cannot hold that the certificate of competency, which obviously was mistakenly issued under the Act of 1910, if Pero was a trust allottee, satisfies the definitely expressed requirement of another act of Congress that there be not only a determination of competency, but also the formal issuance of a patent in fee simple.

In the foregoing discussion we have accepted respondent's assumption that Pero was the holder of a trust patent under the General Allotment Act of 1887 as amended in 1906. Petitioners do not directly question respondent's assumption. But the record of agreed statement of facts shows only that Pero held an allotment of land as a "restricted allotment"; that such allotments "were not subject to conveyance by the owners without permission of the Indian Department or the Federal Government of the United States;" that Pero had received a "certificate of competency" under the Act of 1910 which recited that all restrictions had been removed from Pero's land. The foregoing describe a patent in fee with restrictions more accurately than a "trust patent"; and the Assistant Secretary of the Interior evidently thought that Pero held under a patent in fee with restrictions on alienation, since he issued a certificate of competency under the Act of 1910, which as pointed out above, was authorized only for holders of patents in fee with restrictions on alienation. And if, as the foregoing facts indicate, Pero was an allottee under a restricted patent in fee, the certificate of competency properly was issued under the act of 1910, but at the most could have had the legal effect of removing restrictions on alienation by force of the act of 1910 and of making Pero a citizen of the United States by force of the act of 1887.[21]

We conclude that the District Court did not err in holding that petitioners Moore and Pero are under the exclusive jurisdiction of the United States and that jurisdiction over them in connection with the alleged offense was exclusively in the Federal District Court.

The judgment of the United States District Court for the Eastern Division of Wisconsin is affirmed.

[21] United States v. Celestine, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195.