Dennis VIALPANDO, Appellant
(Defendant),

v.

STATE of Wyoming, Appellee (Plaintiff).

No. 5589.

Supreme Court of Wyoming.

Feb. 5, 1982.

Gerald M. Gallivan, Director, Wyoming Defender Aid Program, Michael Schilling, Wyoming Public Defender Program, and Duane M. Kline, III, Student Intern, Wyoming Defender Aid Program, Laramie, for appellant.

Steven F. Freudenthal, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Crim. Div., Allen C. Johnson, Sr. Asst. Atty. Gen., Dennis C. Cook, Legal Intern, Cheyenne, for appellee.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

BROWN, Justice.

Appellant was convicted by a Fremont County jury of drawing a dangerous weapon in violation of § 6–11–102, W.S.1977, and attempted sexual assault in violation of § 6–4–314, W.S.1977.

Appellant urges a single issue:

"Is the state of Wyoming prohibited from trying this case since it lacks jurisdiction to try Indians acting on the reservation, there being no grant of jurisdiction by the Federal Government?"

We will affirm.

For the purpose of determining the jurisdictional issue, the State and appellant have stipulated to all facts. See appendix at-

tached hereto. The stipulated facts are summarized as follows: The crimes for which appellant was convicted took place on the Wind River Reservation. The victims were non-Indians. The appellant is one-eighth Shoshone Indian.[1] The appellant is not an enrolled member of a tribe, but is afforded certain privileges by the Shoshone tribe. The appellant lives on the Wind River Indian Reservation. He has been treated free of charge at the Bureau of Indian Affairs hospital and has hunted and fished on the Wind River Reservation under non-enrolled fishing permits. Appellant regularly attends the annual Shoshone Pow-Wow and various Indian dances and other cultural events.

Appellant asserts on appeal, as he did in the district court, that 18 U.S.C.A. §§ 1152 and 1153 (1966), confer exclusive jurisdiction in the federal courts to try Indians for the crimes charged by the state.

18 U.S.C.A. § 1152 provides:

"Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.

"This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."

18 U.S.C.A. § 1153 provides:

"Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnapping, rape, carnal knowledge of any female, not his wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and larceny within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."

The State agrees that the above statutes confer exclusive jurisdiction on the federal courts to try Indians for the type of offenses for which appellant was convicted. However, the State does not agree that appellant is an Indian within the contemplation of criminal law.

■ Crimes committed against non-Indians by non-Indians in Indian country are subject to the jurisdiction of the states. *United States v. John*, 587 F.2d 683, 686 (5th Cir. 1979), cert. denied 441 U.S. 925, 99 S.Ct. 2036, 60 L.Ed.2d 399 (1979), citing *United States v. McBratney*, 104 U.S. 621, 26 L.Ed. 869 (1881). Neither 18 U.S.C.A. § 1152, supra, nor any companion criminal jurisdiction statutes contain a definition of the term "Indian," and we know of no statute nor regulation defining an Indian for federal criminal jurisdiction purposes. The Code of Federal Regulations, (C.F.R.), however, has numerous definitions of an Indian for other purposes.[2]

---

1. There appears to be some question whether appellant is even one-eighth Indian. On appellant's non-enrolled Indian fishing permit it states that his father is one-sixteenth Indian and his mother non-Indian. We only have appellant's testimony and the stipulation to indicate that he is one-eighth Indian.

2. 25 C.F.R. § 11.2(c) (1976) defines an Indian for purposes of the jurisdiction of the Courts of Indian Offenses. The definition includes "any person of Indian descent who is a member of any recognized Indian tribe now under federal jurisdiction." Statutory or regulatory definitions of an Indian have been created for purposes other than jurisdiction. See, e.g., 25 U.S.C. § 345 (1970) (for allotment purposes, any person "in whole or in part of Indian blood or descent" included); id. § 302 (for nontreaty educational appropriation purposes a child must have no less than one-fourth Indian blood); 25 C.F.R. § 32.1 (1976) (educational benefit definition paralleling and explaining section 302 definition); id. § 34.3 (persons of

25 U.S.C.A., § 479 (1963) also defines Indians for certain purposes other than criminal jurisdiction:

"The term 'Indian' as used in sections 461, 462, 463, 464, 465, 466–470, 471–473, 474, 475, 476–478, and 479 of this title shall include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and shall further include all other persons of one-half or more Indian blood * * *."

█ The definition of an "Indian" usually depends upon the purpose for which a distinction is made. As regards entitlements the definition of an Indian includes more people than for some other purposes. Criminal jurisdiction over Indians has developed into a complex and confusing maze of federal, state, and tribal statutes, regulation and case law. A review of historical and philosophical reasons for treating Indians differently is not necessary in this opinion. See 18 Ariz.L.Rev. 503 (1976), "Criminal Jurisdiction Over Indian Lands: A Journey Through A Jurisdictional Maze," for an excellent treatise on criminal jurisdiction.

Concerning major crimes, federal jurisdiction is preeminent and specifically covers 14 interracial crimes committed on an Indian reservation. 18 U.S.C.A. § 1153, supra.

Appellant cites *Ex parte Pero*, 99 F.2d 28 (7th Cir. 1938), cert. denied 306 U.S. 643, 59 S.Ct. 581, 83 L.Ed. 1043 (1939), as authority to determine who is an Indian for purposes of 18 U.S.C.A. §§ 1152 and 1153, supra.

█ In *Pero*, two persons convicted in state court of a crime committed on an Indian reservation applied for a writ of habeas corpus, contending that the state courts lacked jurisdiction over a crime committed by an Indian on an Indian reservation. Moore, one of the petitioners, was the son of a fullblood Indian mother and a halfblood Indian father, both of whom resided on an Indian reservation. The court there held:

"We are convinced that the overwhelming weight of authority, both judicial and statutory, requires the conclusion that a child of an Indian mother and halfblood father, where both parents are recognized as Indians and maintain tribal relations, who himself lives on the reservation and maintains tribal relations and is recognized as an Indian, is to be considered an Indian within the protection of the federal guardian-ward relationship and within the meaning of 'Indian' as used in the jurisdictional statute in question. The lack of enrollment in the case of Moore is not determinative of status. Only Indians are entitled to be enrolled for the purpose of receiving allotment and the fact of enrollment would be evidence that the enrollee is an Indian. But the refusal of the Department of Interior to enroll a certain Indian as a member of a certain tribe is not necessarily an administrative determination that the person is not an Indian * * *." *Ex parte Pero*, supra, at 31.

Under this holding it follows that non-enrollment is evidence, albeit not conclusive, that a non-enrolled person is not an Indian.

█ To resolve the issue of whether Moore was an Indian, thereby subject to exclusive federal jurisdiction, the court in *Pero* examined cases which had attempted to formulate a test for the determination of Indian status of persons of mixed blood. The cases had considered three different tests: (1) preponderance of Indian blood, (2) habits of the person, and (3) substantial amount of Indian blood plus a racial status in fact as an Indian. The court in *Pero* found Moore to be an Indian under any of the three tests. The court then approved a test to determine whether or not a person is an Indian for purposes of criminal jurisdiction as follows: "Substantial amount of In-

---

one-fourth or more degree of Indian blood for vocational training programs); 42 C.F.R. § 36.-

12 (1975) (for health services).

dian blood plus a racial status in fact as an Indian." Courts have since looked to a number of factors to determine whether a person is recognized as an Indian, with no single factor dispositive. Recognition might be by society as a whole,[3] the Indian tribe,[4] or the federal government.[5] In later cases, the usual test for persons of mixed blood apparently has been the last one,[6] requiring a person to have a demonstrable but not fixed percentage of Indian blood and be recognized as an Indian.

We have not found any statutes, regulations or cases defining "substantial amount of Indian blood." Webster defines substantial as follows:

" * * * 4a: being that specified to a large degree or in the main. 4b. of or relating to the main part of something." Webster's Third New International Dictionary, Unabridged, p. 2280 (G. & C. Merriam Co. Publishers 1966).

Further,

"It has also been said the word 'substantial' is a relative and not exact term subject to a rule of thumb. It is susceptible of different meanings according to the circumstances of its use. In considering the word, it must be examined in its relation and context, and its meaning gauged by all the surrounding circumstances. [Citations.]" *Smith v. City of Fort Dodge*, Iowa, 160 N.W.2d 492, 498 (1968).

We said in *State ex rel. Peterson v. District Court of the Ninth Judicial District*, Wyo., 617 P.2d 1056 (1980), a civil action, that Ms. Peterson, less than one-fourth Indian by blood, was an Indian for "legal purposes." The Court referred to 25 C.F.R. § 11.2(c) (1976), and 25 U.S.C.A. § 479 (1963), n. 1, p. 1057, for definition of Indians.

Employing the criteria in *Ex parte Pero,* supra, and subsequent cases, we hold that appellant is not an Indian for purposes of criminal jurisdiction with respect to major crimes set out in 18 U.S.C.A. § 1153, supra, and that the District Court for the Ninth Judicial District had jurisdiction to try appellant.

We hold that one-eighth Indian blood is not a "substantial amount of Indian blood" to classify appellant as an Indian. Appellant, therefore, does not meet the first part of the test in *Ex parte Pero,* supra. Nor do we believe that he has "a racial status in fact as an Indian." Factors that we have considered are: Appellant is not an enrolled member of any tribe nor is he apparently eligible for enrollment in the Shoshone Tribe, according to the Shoshone Tribes of the Wind River Indian Reservation ordinances: his life style is not that of an Indian; he lives in a mobile home in a trailer court adjacent to Riverton; and he has been employed by drilling companies, which work "all over the east and western United States."

The Shoshone Tribe does permit appellant to enjoy some benefits of being an Indian. However, some of the so-called benefits enumerated by appellant are not restricted to Indians, e.g., attending Pow-Wows and Indian dances. In summary, appellant's life style is that of a non-Indian except for recreation purposes and visitation. Appellant seeks the best of two worlds and would have this court place him in limbo, not subject to prosecution by either the federal government or the state.

Affirmed.

## APPENDIX

The State of Wyoming and the Defendant, Dennis Vialpando, by and through their respective attorneys, hereby agree that in lieu of holding a hearing to determine the evidentiary basis for the Defend-

---

3. *People ex rel. Schuyler v. Livingstone,* 123 Misc. 605, 205 N.Y.S. 888 (1924).

4. *Ex parte Pero,* 99 F.2d 28 (7th Cir. 1938), cert. denied 306 U.S. 643, 59 S.Ct. 581, 83 L.Ed. 1043 (1939); and *United States v. Gardner,* 189 F. 690 (E.D.Wis.1911).

5. *United States v. Gardner,* supra.

6. *United States v. Ives,* 504 F.2d 935, 936 (9th Cir. 1974).

ant's Motion to Dismiss for Lack of Jurisdiction, the following facts will be stipulated and agreed to:

The Defendant, Dennis Vialpando, is by blood one-eighth Shoshone Indian. His paternal grandmother, Mary E. Vialpando, an enrolled member of the Shoshone Indian Tribe, is by blood one-half Shoshone Indian and has lived her entire life on the Wind River Indian Reservation in central Wyoming. Mary E. Vialpando was born on the Wind River Indian Reservation at Fort Washakie, Wyoming on August 6, 1914. In 1935, she married Manuel Vialpando. Mary E. Vialpando learned from her husband's mother that Manuel Vialpando had Mexican and Navaho Indian blood, but was not interested in such things as racial history and never therefore asked what the exact percentages were. A son, Jay M. Vialpando, was born to Manuel and Mary E. Vialpando at the hospital at Fort Washakie, Wyoming, and was an enrolled member of the Shoshone Indian Tribe. Jay M. Vialpando married a white woman, and a son, Dennis Vialpando, the Defendant herein, was born to them on August 12, 1956 in Fremont County, Wyoming.

Dennis Vialpando is not an enrolled member of the Shoshone Indian Tribe, but has lived on the Wind River Indian Reservation for many years and has been recognized as an Indian by the Shoshone Indian Tribe and others. Dennis Vialpando has been treated—free of charge—at the BIA run Indian health clinic at Fort Washakie, Wyoming. He has also hunted and fished the lands of the Wind River Indian Reservation under Indian permits, and has never applied for or used a non-Indian hunting or fishing permit on the reservation. Dennis Vialpando currently holds a nonenrolled Indian fishing permit for the Wind River Indian Reservation.

Dennis Vialpando himself exhibits many of the distinct facial and racial characteristics of Indians and is fairly dark skinned. Like most other residents of the Wind River Indian Reservation, Dennis Vialpando lives in a mobile home. His mobile home is located within the exterior boundaries of the Wind River Indian Reservation. Dennis Vialpando has maintained contact with his Indian relatives, including his brother and grandmother, and frequently visits them. He attends the annual Shoshone Pow-Wow, the various Indian dances and other Indian cultural events, including the annual Pow-Wow held at Sundance, Wyoming. Dennis Vialpando also takes his children to these events so that they may learn and appreciate Indian heritage. Dennis Vialpando takes great pride in his Indian ancestry and heritage and in fact this criminal action initially arose out of his efforts to enforce tribal game and fish regulations against three whites who were fishing on the Wind River Indian Reservation without non-Indian fishing permits. Finally, Dennis Vialpando has experienced numerous incidents of racial discrimination because of his Indian ancestry.

ROONEY, Justice, concurring.

I concur. The court's opinion is pursuant to established law. The result is proper. However, I want to record my disagreement with the ambivalence and inconsistency which has been the characteristic of the attention given through the years by others to issues of the nature of the one here presented.

The concept of race and the concept of sovereignty are customarily intertwined in consideration of Indian matters. I believe that they should not be. I further believe that racism is an improper factor upon which to resolve matters such as this. Indian sovereignty would be a more satisfactory basis for resolution of the issue of this and similar cases, but I believe it no longer exists and remains only a facade which hides the true status of Indians.

Race or national origin should not be a determinant affecting the status of any individual. As is often said, the United States is a melting pot in this respect. Amalgamated here are those of all races and national origins: Italians, Chinese, Germans, Blacks, Irish, English, Chicanos, Yellow, French, etc.—including American Indians or Red people. The amalgamation has

not been without areas of difficulty. And in some instances, it is not yet complete. But it has been accomplished here to a far greater extent and more comprehensively than has been done anywhere else at any other time.

The American Indians have been extensively included in this amalgamation. Those with Indian blood form a creditable percentage of the population of the United States. The percentage would undoubtedly be much higher—to the benefit of the Indians and of others—had not it been retarded by well-intentioned but short-sighted efforts by some to accentuate racial differences and, thus, to sharpen racial separation and discrimination.

In any event, the determination of this and of similar cases should not be premised to any extent on blood lines, racism or national origin.

Sovereignty of Indian nations, tribes and groups is a hybrid and nebulous thing. Such sovereignty is certainly not the sovereignty commonly attributed to nations for application of international law.

"* * * By 'sovereignty' in its largest sense is meant supreme, absolute, uncontrollable power, the absolute right to govern. * * *" Black's Law Dictionary, 5th Ed. 1979, p. 1252.

By virtue of wars, treaties, constitutional provisions and legislation, the United States has the absolute power and right to govern the Indians within the United States. The Indian tribes and nations have only those powers allocated to them by the United States. For example, the Major Crimes Act of 1885 (Ch. 341, § 9, 23 Stat. 385, now 18 U.S.C. § 1153) gave jurisdiction to the federal courts over seven crimes (now thirteen) committed by Indians in Indian country. Another example: The Indian Civil Rights Act of 1968 (Public Law 90–284, Title II, § 202, 82 Stat. 77, now 25 U.S.C. §§ 1302–1303) made those constitutional rights as recognized by the United States to be effective in tribal court matters. It set a maximum sentence of six months or maximum fine of $500.00 as that which could be imposed by a tribal court, and it allowed habeas corpus to federal courts to test the legality of detention by a tribe.

Reservations were established for Indian occupancy. Many no longer exist and the occupancy purpose has become of lesser importance in others. The General Allotment Act of 1887 (Dawes Act) (Ch. 119, § 1, 24 Stat. 388, now 25 U.S.C. § 331) was designed, in part, to break up the reservation system. A number of Indian tribes or groups were made subject to state jurisdiction under Ch. 505, § 2, 67 Stat. 588, now 18 U.S.C. § 1162.

And the vacillating policy of the United States with respect to Indians has, at times, resulted in occasional grant of additional governing power, e.g., the Indian Reorganization Act of 1934 (Ch. 576, § 1, 48 Stat. 984, now 25 U.S.C. § 461) which confirmed the reservation system. But whether the legislature grants or restricts the power of Indian tribes and nations, the fact that such legislation is determinative evidences the lack of true sovereignty by such tribes or nations. If Indian tribes are "domestic dependent nations" as described in *Cherokee Nation v. State of Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831), they are more "dependent" and "domestic" than they are "nations."

I do not contend this to be either bad or good. But history records the coming and going of sovereignties and the changes in political boundaries of nations over the centuries. Such is occasioned by wars, violences of nature, agreements, etc. Failure to recognize the practicality of that history is senseless.

Although Indian tribal sovereignty, from the practical standpoint, exists only in the language of official documents (including court opinions), it does exist to that extent. Maintaining practicality, then, I must acknowledge that both the United States and the Indian tribes recognize the existence of the tribal sovereignty to the extent that the tribe can determine its own nationals, i.e., citizens or subjects, through enrollment in the tribe.

" * * * The law of nationality—what constitutes it, how it is acquired, and how lost—is a part of internal, rather than international, law. Thus, a state or nation may apply its own law to determine what individuals are or are not its nationals, provided there exists a genuine link between the state and the individual * * *." 48 C.J.S. International Law, § 7, p. 11.

The Shoshoni Indians have not enrolled appellant in their tribe, and they do not consider him eligible to be so enrolled. I believe this to be the proper basis for affirmance.